R. Michael Ghilezan, Esq. (State Bar No. 282340)
**THE GHILEZAN LAW FIRM**
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone:    (866) 610-5927
Facsimile:    (310) 388-0315

Robert Zarco, Esq. (FBN 502138) (admitted *pro hac vice* admission)
Himanshu M. Patel (FBN 0167223) (admitted *pro hac vice* admission)
F. Alaina Rodriguez (FBN 1070046) (admitted *pro hac vice* admission)
**Zarco Einhorn Salkowski, P.A.**
2 S. Biscayne Blvd. 34th Floor
Miami, Florida 33131
Telephone: 305-374-5418
Fax: 305-374-5428

Attorneys for Plaintiffs
So Cal Storage, LLC, Bay Area Storage, LLC,
NIMA Group LLC, and TAJ Units Holdings, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| So Cal Storage, LLC, a California limited liability company, Bay Area Storage, LLC, a California limited liability company, NIMA Group LLC, a California limited liability company, and TAJ Units Holdings, LLC, a California limited liability company<br><br>　　　Plaintiffs,<br><br>　　　vs.<br><br>UNITS Franchising Group, Inc., a South Carolina corporation,<br><br>　　　Defendant. | Case No. 2:25-cv-10222-WLH-BFM<br>Assigned for All Purposes To:<br>Judge: Wesley L. Hsu<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>**(1)　Fraudulent Misrepresentation;**<br>**(2)　Negligent Misrepresentation;**<br>**(3)　Breach of Contract (National Advertising Fund);**<br>**(4)　Breach of Contract (Unreasonable Profit and Non-Competitive Pricing);**<br>**(5)　Breach of Contract Accompanied By Fraud;**<br>**(6)　Breach of Contract (Duty of Reasonableness and Good Faith);**<br>**(7)　Violation of the California Franchise Investment Law, Cal. Corp. Code § 31202; and**<br>**(8)　Unjust Enrichment.**<br><br>　　　**DEMAND FOR JURY TRIAL** |

1

FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiffs, So Cal Storage, LLC, Bay Area Storage, LLC, NIMA Group LLC, and TAJ Units Holdings, LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, hereby submit this First Amended Complaint and in support thereof, state as follows:

### NATURE OF THIS ACTION

1. This case involves an unfortunately all too familiar example of a franchisor, motivated by the greed of its founder/owner, Michael McAlhany, that has used its vast power in the franchise relationship to extract more fees from franchisees than it is contractually entitled to receive, both directly and indirectly, through vendor relationships. Since the inception of the franchise relationship, Plaintiffs were destined to fail because their decision to invest in the UNITS brand was premised on false and misleading representations, made in the pre-sale disclosure documents Defendant, UNITS Franchising Group, Inc. ("UFG"), furnished to each Plaintiff, that the products and services offered through the business opportunity were unique and proprietary in ways that set the brand apart from its competitors. Plaintiffs later learned that these representations were nothing more than fraudulent statements that UFG made to entice them to invest in the UFG franchise system. In reality, the products and services are not unique and proprietary, as competitors in this industry have access to and are utilizing the same products and services.

2. Plaintiffs are current UNITS franchisees who operate a UNITS franchised business pursuant to the terms of a franchise agreement that they each executed with UFG. Before joining the UNITS system, Plaintiffs had built and operated successful self-storage businesses.

3. Most recently, UFG forced franchisees to implement an ill-planned and defective point-of-sale system ("POS"), i.e., StoreSmart. Among other severe problems, the deficiencies with the POS caused billing errors and produced inaccurate reports, which wreaked havoc and caused financial harm to the franchisees' businesses and negatively

FIRST AMENDED COMPLAINT FOR DAMAGES

impacted Plaintiffs' relationships with their existing customers.

4.    To make matters worse, and despite the many franchisees who are in dire financial straits or who have been forced to cease operations as a result of UFG's misrepresentations and other failures, UFG has continued to improperly force Plaintiffs to purchase non-proprietary products at significantly above-market rates from suppliers and brokers for its own personal benefit without regard to the reasonable commercial interests and economic well-being of its franchisees.

5.    UFG also exploited Plaintiffs' local marketing expenditures for its own long-distance moves ("LDM") by solely relying on Plaintiffs' customer leads to generate its LDM customers all while paying Plaintiffs nothing in return. UFG has also diverted the National Advertising Fund contributions that Plaintiffs are required to pay—monies that may not be used to defray UFG's general operating expenses—to pay, among other things, UFG's own corporate salaries.

6.    Through this action, Plaintiffs seek damages and restitution arising from UFG's fraudulent and negligent misrepresentations, its breaches of the parties' franchise agreements and of the implied covenant of good faith and fair dealing, its violation of the California Franchise Investment Law, and its unjust enrichment at Plaintiffs' expense.

## THE PARTIES

7.    Plaintiff, So Cal Storage, LLC ("So Cal"), is a California limited liability company with its principal place of business in Los Angeles, California. All of So Cal Storage, LLC's members are California residents. So Cal Storage, LLC entered into a Franchise Agreement with Defendant on or around December 19, 2022 (the "2022 Franchise Agreement").

8.    Plaintiff, Bay Area Storage, LLC ("Bay Area"), is a California limited liability company with its principal place of business in Livermore, California. All of Bay Area Storage, LLC's members are California residents. Bay Area Storage, LLC entered into a Franchise Agreement with Defendant on or around August 28, 2019 (the "2019

3

FIRST AMENDED COMPLAINT FOR DAMAGES

Franchise Agreement").

9.      Plaintiff, NIMA Group LLC ("NIMA"), is a California limited liability company with its principal place of business in Rocklin, California. All of NIMA Group LLC's members are California residents.  NIMA Group LLC entered into a Franchise Agreement with Defendant on or around July 1, 2008 (the "2008 Franchise Agreement").

10.     Plaintiff, TAJ Units Holdings, LLC ("TAJ"), is a California limited liability company with its principal place of business in Ventura County, California. All of TAJ Units Holdings, LLC's members are California residents. TAJ Units Holdings, LLC entered into a Franchise Agreement with Defendant on or around August 6, 2020 (the "2020 Franchise Agreement").[1]

11.     Defendant, UNITS Franchising Group, Inc. ("UFG"), is a South Carolina corporation with its principal place of business in Daniel Island, South Carolina. UFG is the franchisor of the UNITS Moving and Portable Storage franchise system.

**JURISDICTION AND VENUE**

12.     Jurisdiction of this Court over this action is invoked pursuant to 28 U.S.C. § 1332(a)(1).  There is complete diversity of citizenship between Plaintiffs and Defendant, and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

13.     Jurisdiction over UNITS Franchising Group, Inc. ("Defendant" or "UFG") is proper because UFG had sufficient continuous and systematic minimum contacts with California such that it foresaw the possibility of being sued in this state, including but not limited to, conducting significant business activities in this state, selling franchises in this state, collecting royalties in this state and engaging in the conduct which is the subject matter of this dispute.

14.     Pursuant to the California Franchise Relations Act or more specifically, California Business and Professions Code Section 20040.5, any "provision in a franchise

---

[1] Plaintiffs' respective franchise agreements are collectively referred to as the "Franchise Agreements." A true and correct copies of Plaintiffs' respective Franchise Agreements are annexed hereto as **Composite Exhibit A.**

4

agreement restricting venue to a forum outside this state is void with respect to any claim arising under or relating to a franchise agreement involving a franchise business operating within this state." Thus, California is the proper forum for this dispute.

15. Venue is proper in, and UFG is subject to the personal jurisdiction of, this Court because UFG maintains a presence in this District via its franchisees, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

**A.     The FTC Franchise Rule**

16. UFG solicits prospective franchisees in California and, in connection with each such offer and sale, is required to furnish a Franchise Disclosure Document ("FDD") to the prospective franchisee.

17. The FTC Franchise Rule, 16 C.F.R. § 436, sets forth comprehensive requirements for franchise disclosure documents, including twenty-three (23) categories of information that must be disclosed in the FDD. 16 C.F.R. § 436.5.

18. Among other things, Item 1 of the FDD requires a franchisor to disclose the type of business the prospective franchisee will conduct; the general market for the product or service the prospective franchisee will offer; and a general description of the competition. *Id.* § 436.5(a).

19. Item 8 requires a franchisor to disclose the franchisee's obligations to purchase goods and services from the franchisor or from designated suppliers and, for each such obligation, "[w]hether the franchisor or its affiliates will or may derive revenue or other material consideration from required purchases or leases by franchisees," including the amount or percentage of such revenue. *Id.* § 436.5(h). Item 8 further requires a franchisor to disclose whether "a designated supplier will make payments to the franchisor from franchisee purchases" and to "disclose the basis for the payment." *Id.* The FTC Rule expressly makes clear that "a 'payment' includes the sale of similar goods or services to the franchisor at a lower price than to franchisees." *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES

20.    Item 10 requires disclosure of financing arrangements and whether the franchisor or an affiliate receives consideration for placing financing with a lender. *Id.* § 436.5(j).

21.    A franchisor's failure to set forth all material facts necessary for a prospective franchisee to make an informed business decision, and to present all material facts accurately in its FDD constitutes an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act as well as a violation of the California Franchise Investment Law ("CFIL"). *Id.* § 436.2; Cal. Corp. Code § 31202.

**B.    UFG's Untrue Statement Regarding the UNITS System**

22.    UFG markets the UNITS opportunity as a business that "operates according to [UFG's] proprietary system." Each Plaintiff received an FDD before signing its Franchise Agreement, and each such FDD represented that the UNITS system was proprietary and that UFG was the exclusive source of the containers and equipment.

23.    Bay Area received UFG's 2019 FDD before executing the 2019 Franchise Agreement. Item 1 of the 2019 FDD stated that each UNITS Business "operates according to our proprietary system, the characteristics of which include: (a) proprietary, custom-built containers (the 'UNITS® Containers') and related equipment . . . ." Item 8 stated that UFG was "the only approved supplier of UNITS® Containers . . . and there are no alternate sources of supply." Item 8 further stated that UFG "developed a line of proprietary products which are used in the operation of all UNITS® Businesses."

24.    TAJ received UFG's 2020 FDD before executing the 2020 Franchise Agreement. Items 1 and 8 of the 2020 FDD contained identical representations as the 2019 FDD.

25.    NIMA received UFG's 2008 FDD before signing the 2008 Franchise Agreement. The 2008 FDD contained materially the same representations regarding a proprietary system and UFG's exclusive supply of containers and equipment.

26.    So Cal received UFG's 2022 FDD before executing the 2022 Franchise

6

FIRST AMENDED COMPLAINT FOR DAMAGES

Agreement. Items 1 and 8 of the 2022 FDD contained materially the same representations as the 2019 FDD.

27.     Plaintiffs recently learned that UFG's representations regarding a proprietary system were blatantly false and misleading.

28.     Specifically, there is nothing proprietary about the UNITS containers or mules. UFG does not manufacture them. The containers are manufactured and sold by vendors such as Havener, USC, and Boxwell, and the mules are manufactured by Cardinal. These third-party vendors manufacture and sell the identical products to the general public, to traditional self-storage operators, and to UFG's competitors.

29.     To the extent UFG claims that modifications it requested (for example, to container pockets or to the mule design) render the products "proprietary," those modifications were not exclusive to UFG: the vendors made the same modifications available to their other customers.

30.     UFG knew its "proprietary system" representation was untrue when it made it. UFG itself contracted with these third-party vendors, UFG itself placed and paid for the orders, and UFG itself knew that those vendors sold the identical products to the general public and to UFG's competitors.

31.     UFG reinforced these false representations during the franchise relationship, including: through Section 12.2 of the Franchise Agreements (Section 13.2 of the 2008 Franchise Agreement) which states the following, in relevant part:

> UFG has "*developed* and/or acquired a line of UNITS® Equipment, including transportable, mobile, self-storages UNITS ® Containers self-storage. . . Franchisee acknowledges and agrees that the UNITS® Equipment developed and furnished by Franchisor are [sic] distinctive as a result of being *developed* pursuant to the combined experience of Franchisor and its Affiliate . . . Franchisee agrees to order and purchase all of its requirements of UNITS® Equipment exclusively from Franchisor . . . .

FIRST AMENDED COMPLAINT FOR DAMAGES

Ex. A, 2008 Franchise Agreement, § 13.2; 2019 Franchise Agreement, § 12.2; 2020 Franchise Agreement, § 12.2; 2022 Franchise Agreement, § 12.2 (emphasis added).

32.    The Item 8 representations quoted above were untrue when made. Identical containers and mules were, and are, freely available from third-party vendors, such as Boxwell and Cardinal, to the general public and to UFG's competitors at materially lower prices. UFG knew these facts because UFG itself was the purchaser from those vendors.

33.    Item 8 of the FDDs also set out the criteria UFG represented it would apply to a franchisee's request to use an alternative supplier. Such criteria included the ability to provide sufficient quantity of product; quality of products and/or services at competitive prices; production and delivery capability; and dependability and general reputation of the supplier. This representation, combined with the "no alternate sources of supply" representation, further misled Plaintiffs into believing that the containers and mules were the type of supplies that could not be purchased from any other vendors.

**C.    UFG's Undisclosed Vendor Revenue and Relationships**

34.    Item 8 of the FDDs also stated that "[w]e and our affiliates reserve the right to derive revenue based on your required purchases or leases," and quantified that revenue. For example, the 2019 FDD stated: "During our most recent fiscal year ended December 31, 2018, we derived approximately $821,500 in revenue from required franchisee purchases and leases, which represented approximately 11% of our total revenues of $7,511,027." The 2020 FDD stated: "During our most recent fiscal year ended December 31, 2019, we derived approximately $515,122 in revenue from required franchisee purchases and leases, which represented approximately 21.40% of our total revenues of $2,406,063." The 2022 FDD stated: "During our most recent fiscal year ended December 31, 2021, we derived approximately $521,545 in revenue from required franchisee purchases and leases, which represented approximately 7.9% of our total revenues of $6,622,296."

35.    Under Item 10 of the FDDs, UFG represented that it "do[es] not offer direct

FIRST AMENDED COMPLAINT FOR DAMAGES

or indirect financing."

36.    On information and belief, the quantified disclosures in Item 8 of the FDDs understated the revenue, rebates, markups, and other consideration UFG, in fact, derived from franchisee-required purchases and from its vendor relationships.

37.    While UFG's FDDs disclosed in general terms that UFG "reserve[d] the right to derive revenue" from required purchases and to "retain volume rebates, markups and other benefits," UFG failed to disclose the material facts necessary to make those statements not misleading, including: (a) the identity of the third-party vendors that actually manufacture the "proprietary" equipment (i.e., Boxwell, Cardinal, and Transource); and (b) the basis for the payments UFG received from such third-party vendors from Plaintiffs' purchases.

38.    UFG also failed to disclose material consideration it derived from other vendor relationships that it required or steered franchisees into, including: (a) the Storage Protectors tenant-insurance program; (b) Transource, the broker/source for required trucks; and (c) Live Oak Banking Company ("Live Oak"), the lender UFG steered franchisees toward for equipment and franchise financing. UFG's own financial statements reflect a lending/lease relationship with Live Oak Bank; yet, UFG did not disclose that relationship, or any consideration it received in connection with franchisee financing, in Item 8 or Item 10 of the FDDs.

39.    UFG likewise failed to properly disclose the purchasing restrictions it imposed in practice—including its refusal to permit franchisees to purchase used equipment, to purchase equipment from other franchisees, or to purchase directly from UFG's own approved vendors—and the related financial benefits it received from franchisee-required purchases, under Item 8 of its FDDs.

**D.    Plaintiffs' Reliance on UFG's Misrepresentations and Omissions**

40.    Each Plaintiff relied upon UFG's representations in Item 1 of the FDD regarding its unique and proprietary "System," as reinforced through UFG's Item 8

FIRST AMENDED COMPLAINT FOR DAMAGES

representations regarding the absence of alternate sources of supply, as part of that Plaintiff's ultimate decision to invest in the UNITS franchise opportunity.

41.    Those representations and omissions were material to each Plaintiff's decision to invest in the UNITS franchise opportunity.

42.    Each Plaintiff reasonably believed that UFG, as an established franchisor subject to comprehensive federal and state disclosure requirements, would provide accurate and complete information about the franchise opportunity, and Plaintiffs had no reason to doubt the accuracy of UFG's representations at the time they were made.

43.    Had each Plaintiff known that UFG did not have a proprietary system or proprietary, custom-built containers, that identical equipment was available from third parties to the general public at materially lower prices, and that UFG derived undisclosed revenue and other consideration from franchisee-required purchases and from its vendor and lender relationships, each Plaintiff would not have invested in the UNITS franchise system and/or would have negotiated materially different terms so that they could have avoided substantial losses.

**E.    UFG's Breaches of the Franchise Agreements**

*(i)    The UNITS Equipment*

44.    Section 12.2 of the 2019, 2020, and 2022 Franchise Agreements and Section 13.2 of the 2008 Franchise Agreement obligate UFG to make the UNITS Equipment (in the 2008 Franchise Agreement, the "UNITS Products") available to the franchisee and to do so at *competitive* prices, while limiting UFG to a reasonable profit. Specifically, Section 12.2 of the 2019 and 2020 Franchise Agreements provides that:

  a. UFG "has developed and/or acquired a line of UNITS® Equipment, including transportable, mobile, self-storage UNITS® Containers, UNITS® Portable Storage Delivery Systems, packing and moving supplies and other items bearing the Marks which are specially suited for use in connection with the Franchised Business;"

10

FIRST AMENDED COMPLAINT FOR DAMAGES

b.  "the UNITS® Equipment developed and furnished by Franchisor are [sic] distinctive as a result of being developed pursuant to the combined experience of Franchisor and its Affiliate(s) and are inextricably interrelated with the Marks," that "Franchisee agrees to order and purchase all of its requirements of UNITS® Equipment exclusively from Franchisor, its Affiliate or a supplier designated by Franchisor;" and

c.  "Franchisor commits to provide the UNITS® Equipment at *competitive* prices; however, Franchisee acknowledges that Franchisor and its Affiliate(s) have the right to earn a reasonable profit on the sale of its UNITS® Equipment."

Ex. A, 2019 Franchise Agreement § 12.2; 2020 Franchise Agreement § 12.2 (emphasis added).

45.     Section 12.2 of the 2022 Franchise Agreement is materially identical and likewise provides that "Franchisor commits to provide the UNITS Equipment at *competitive* prices; however, Franchisee acknowledges that Franchisor and its Affiliate(s) have the right to earn a reasonable profit on the sale of its UNITS Equipment." Ex. A, 2022 Franchise Agreement, § 12.2 (emphasis added).

46.     Section 13.2 of the 2008 Franchise Agreement is materially identical and provides that "Franchisor commits to provide the UNITS Products at *competitive* prices; however, Franchisee acknowledges that Franchisor and its Affiliate(s) have the right to earn a reasonable profit on the sale of its UNITS Products." Ex. A, 2008 Franchise Agreement, § 13.2 (emphasis added).

47.     After each Plaintiff executed its Franchise Agreement, and continuing to the present, UFG required each Plaintiff to purchase containers, mules, trailers, trucks, and other equipment exclusively through UFG or a supplier UFG designated, and charged prices that were not competitive and that yielded UFG a substantial profit that was not commercially reasonable beyond any stretch of the imagination.

FIRST AMENDED COMPLAINT FOR DAMAGES

48. Notwithstanding UFG's contractual obligation under the Franchise Agreements, there is a substantial price discrepancy between UFG's prices and the prices at which the same products are available directly from vendors. On information and belief, the markup UFG charged Plaintiffs on Boxwell containers was the highest markup Boxwell applied to any of its customers. By way of example, one Plaintiff purchased identical Boxwell containers directly for approximately $800 less per container than UFG charged. UFG, thereby, breached Section 12.2 of the 2019, 2020, and 2022 Franchise Agreements (13.2 of the 2008 Franchise Agreement) by failing to provide competitive prices and by earning a commercially unreasonable profit on its sale of UNITS Equipment to Plaintiffs.

49. Section 12.1 of the 2019, 2020, and 2022 Franchise Agreements and Section 13.1 of the 2008 Franchise Agreement establish the process by which a franchisee may seek approval of an alternative supplier. *See* Ex. A, 2008 Franchise Agreement, § 13.1; 2019 Franchise Agreement, § 12.1; 2020 Franchise Agreement, § 12.1; 2022 Franchise Agreement, § 12.1. Despite this process, UFG ultimately retains the right to decide whether to approve or deny an alternate vendor.

50. Section 21.14 of the 2019, 2020, and 2022 Franchise Agreements and Section 22.14 of the 2008 Franchise Agreement state that "both Franchisor and Franchisee *shall* act reasonably *and* in good faith. If the consent of either party is required or contemplated hereunder, the party whose consent is required shall not unreasonably withhold consent, unless such consent is expressly subject to such party's sole discretion pursuant to the terms of this Agreement." Ex. A, 2008 Franchise Agreement, § 22.14; 2019 Franchise Agreement, § 21.14; 2020 Franchise Agreement, § 21.14; 2022 Franchise Agreement, § 21.14. Thus, even if UFG has discretion over the approval of an alternative supplier under the Franchise Agreements, UFG is required to act in good faith when a franchisee requests approval of an alternative supplier.

51. The Franchise Agreements contemplate an alternative supplier approval

12

FIRST AMENDED COMPLAINT FOR DAMAGES

process, and UFG is obligated to decide within a reasonable time, on the criteria specified in Section 12.1 (Section 13.1 of the 2008 Franchise Agreement), whether a franchisee may purchase from a proposed supplier. Yet any time that Plaintiffs have sought alternative suppliers for equipment or containers, they have been met with blanket denials from UFG, which has consistently maintained the position that all container and equipment purchasing must go through UFG directly.

52.    Throughout the franchise relationship, UFG required that all container and equipment purchasing route through UFG. UFG reinforced that requirement through its Vice President of Franchise Operations, Erik Lorensen, and through its regional developers, who repeatedly told Plaintiffs that all container and equipment purchasing had to go through UFG.

53.    Plaintiffs are entitled to utilize and transact with alternative vendors to procure products and equipment necessary to run their businesses, especially when the equipment or product at issue is non-proprietary and can be sourced by the general public.

54.    On several prior occasions, and most recently in late 2024, Plaintiffs raised issues with the cost of containers offered by UFG and identified other third-party vendors that could provide containers at a lower cost. In response, and absent any explanation, UFG—through its Vice President of Franchise Operations, Erik Lorensen—consistently maintained the position that all container and equipment purchasing must go through UFG directly.

55.    Over the past several years, UFG has placed a growing number of restrictions on its franchisees with respect to containers and equipment absent any legitimate business reason or contractual basis to justify its actions. Specifically, UFG has restricted franchisees' ability to purchase: (i) identical or substantially similar equipment at a much lower price; (ii) used equipment or containers; and (iii) new or used containers and equipment from existing franchisees.

56.    For instance, UFG required franchisees to purchase trucks through a broker

FIRST AMENDED COMPLAINT FOR DAMAGES

(even though the trucks themselves can be sourced directly from common manufacturers at a lower price) and trailers from a sole approved vendor, Cardinal, both in brand new condition. On average, franchisees have waited more than six months for the trailers to be completed by UFG's "approved" vendor, with some franchisees waiting nearly a year after submitting payment to receive their trailer. During this waiting period, or in the event a fleet truck or trailer is unavailable due to repairs (both of which are regular occurrences), franchisees were forced to either operate in a limited capacity or rent a used truck or trailer from UFG at an exorbitant price.

57.    Plaintiffs have also faced various quality control issues with the containers provided by UFG, including but not limited to water intrusions, rusting, and other complications as a result of surrounding weather conditions. The equipment UFG supplied at above-market prices was of subpar quality.

58.    UFG's refusal to consider reasonable alternatives not only compounds Plaintiffs' existing losses through increased container and equipment costs, but also negatively impacts franchisees' ability to generate revenue due to delays and other issues associated with UFG's unreasonable specifications and payment terms.

59.    UFG has breached the implied covenant of good faith and fair dealing by refusing to meaningfully consider alternative suppliers and equipment options for non-proprietary goods such as containers, trailers, robotic loading equipment, and trucks, all of which are necessary for UNITS franchisees to operate their businesses. UFG rejected such requests outright, without any explanation, without applying the criteria specified in the Franchise Agreements, and without any legitimate business justification.

### (ii)    *UFG Actively Concealed the True Source and Cost of the Equipment Throughout the Franchise Relationship*

60.    Throughout the franchise relationship, and after each Plaintiff signed its Franchise Agreement, UFG had superior and, in material respects, exclusive knowledge of facts not reasonably discoverable by Plaintiffs, including: (i) that the UNITS containers

14

FIRST AMENDED COMPLAINT FOR DAMAGES

and mules were off-the-shelf products manufactured by Havener, USC, Boxwell and Cardinal and sold to the general public at materially lower prices; (ii) the identity of the actual manufacturers of the equipment Plaintiffs were required to purchase; (iii) the prices at which those manufacturers sold the identical products to other purchasers; and (iv) the magnitude of the markup UFG imposed when it resold those products to Plaintiffs.

61. UFG knew that if Plaintiffs learned the containers and mules were off-the-shelf products available at lower prices, Plaintiffs would purchase them elsewhere and UFG would lose its concealed markup. UFG, therefore, took deliberate steps, throughout the franchise relationship and after each Plaintiff signed, to prevent Plaintiffs from learning the truth, including: (i) continuing to represent to Plaintiffs during the relationship that there were no alternate sources of supply; (ii) ensuring that all purchases went through UFG; and (iii) instructing its "approved" vendors, such as Boxwell, not to communicate or transact directly with Plaintiffs, and to redirect any franchisee purchasing inquiry back to UFG. On information and belief, Boxwell honored UFG's instruction to preserve its business relationship with UFG. As a result, Plaintiffs were structurally prevented from learning the products' true source and price.

62. It was only recently—after an apparent falling-out between UFG and Boxwell caused Boxwell to deal transparently with Plaintiffs for the first time regarding pricing—that Plaintiffs discovered that the products were freely available to the public, that the products were not proprietary, and that UFG had concealed both the true source of supply and the magnitude of its markup.

63. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of UFG's concealment or of the facts constituting the violations alleged herein until late 2024 at the earliest. UFG's affirmative concealment, its instructions to its vendors, and its exclusive control of the supply chain prevented Plaintiffs from discovering those facts earlier.

64. Had Plaintiffs known the concealed facts, they would have purchased

FIRST AMENDED COMPLAINT FOR DAMAGES

equipment from alternative sources at lower prices, would not have paid UFG's inflated markup, and would have made materially different business decisions.

### (iii) Computer Software and Point-of-Sale System

65. Plaintiffs' respective Franchise Agreements require Plaintiffs to purchase and use the computer and point-of-sale system that UFG designates, and to pay a monthly software fee. Under Section 11.5 of the 2019 and 2020 Franchise Agreements and Section 12.5 of the 2008 Franchise Agreement, that fee of "$200 to $400 per month" is expressly consideration "for site license and the support of UNITS® operating software." Although the term "support" is omitted from the 2022 Franchise Agreement, So Cal pays the same fee as the other Plaintiffs for UFG's POS System. UFG is, therefore, obligated to provide all Plaintiffs the support for which it charges.

66. Section 13.1 of the 2019, 2020, and 2022 Franchise Agreements and Section 14.1 of the 2008 Franchise Agreement further obligate UFG to "be available to render advice, discuss problems, and offer general guidance to Franchisee . . . with respect to . . . operating the Franchised Business."

67. Section 9.2 of the 2019, 2020, and 2022 Franchise Agreements and Section 10.2 of the 2008 Franchise Agreement authorize UFG to "change or modify the System from time to time including, *without limitation*, . . . new or additional computer hardware, software, equipment, inventory, supplies, or sales and marketing techniques," and provide that "Franchisee shall make such expenditures as such changes, additions or modifications in the System may reasonably require."

68. Beginning in 2023, UFG used its discretion under Section 9.2 of the 2019, 2020, and 2022 Franchise Agreements (Section 10.2 of the 2008 Franchise Agreement) to designate a new POS/CRM system, i.e., StoreSmart, and required franchisees to migrate to it. StoreSmart was defective. During its development, a test group of franchisees identified numerous bugs and glitches, and UFG's own 2023 FDD acknowledged it "might not be able to alter the Proprietary Software Program and system to accommodate each

FIRST AMENDED COMPLAINT FOR DAMAGES

and every franchisee of the System."

69.    Despite the known presence of bugs and/or glitches in the software and potential compatibility issues, the roll-out was accelerated and franchisees were given less than one month's notice, in May 2024, that they would be charged the new software fee and that the migration process would begin in June 2024. UFG deployed StoreSmart system-wide without adequate testing and during the portable-storage industry's well-known peak season (the summer months) when franchisees could least afford disruption. In connection with the roll-out, no support services or resources were made available to franchisees by UFG except for incomplete training videos.

70.    From the outset (May 2024), Plaintiffs experienced continuous and ongoing issues with the StoreSmart POS, including but not limited to: client billing issues; inaccurate royalty reconciliations; incorrect pricing of services; inability to process discounts to clients; incorrect or missing inventory counts; franchisees being billed by credit card processing companies for initiating erroneous transactions; and inability to obtain reliable and accurate reports. These issues have persisted until the present day.

71.    A ticket system was implemented by the software vendor, Suntech, to address the overwhelming variety of technical issues and problems experienced by Plaintiffs. Over two thousand (2,000) tickets have been submitted by UFG franchisees, inclusive of Plaintiffs, related to various issues with the StoreSmart software, but no meaningful solution has been provided to franchisees, as Suntech has failed to identify the source of many common issues as a starting point before any bugs can be fixed.

72.    UFG failed to take appropriate steps to effectively and timely remedy the pervasive and still-existing StoreSmart POS software issues, causing further disruption in Plaintiffs' business operations. Several franchisees expressed concerns and ongoing issues with the StoreSmart software, but rather than slowing down or halting the transition altogether, UFG rolled out the problem-ridden StoreSmart software systemwide.

73.    UFG charged Plaintiffs migration and monthly fees for StoreSmart while

17

FIRST AMENDED COMPLAINT FOR DAMAGES

failing to deliver the functional software and support for which those fees were charged. Thousands of support tickets submitted through the vendor (Suntech) went unresolved. UFG failed to provide Plaintiffs their monthly operations reports following the migration, and UFG's own personnel acknowledged the delays and problems caused by the premature launch.

74.    The rollout caused severe harm and disruption to Plaintiffs' businesses. For TAJ, the disruption crippled TAJ's business, caused losses well in excess of $100,000, and marked the beginning of the end of TAJ's viability as TAJ never recovered. For the remaining Plaintiffs, StoreSmart was so defective that they could not complete migration at all. Attempted migration duplicated customer records two, three, or four times, and the system could not differentiate the distinct municipal tax rates applicable to different California cities. These Plaintiffs abandoned the migration and remained on SiteLink to preserve access to their customer data; yet, UFG continued to charge them fees in connection with the attempted migration.

75.    Plaintiffs have suffered monetary damages as a result of UFG's wrongful conduct. UFG acknowledged the significant issues with StoreSmart on several occasions but has yet to offer any meaningful relief or resolution to franchisees to address these ongoing software issues.

### (iv)    *National Advertising Fund/Brand Fund*

76.    Plaintiffs seek transparency regarding UFG's use of the National Advertising Fund. Several franchisees, including Plaintiffs, expressed concerns over the lack of marketing strategies on UFG's part in growing systemwide sales and promoting the overall UNITS brand. For example, significant expenses are paid out of the National Advertising Fund to marketing firms such as 919 Marketing, which have added little to no value to the franchisees' businesses.

77.    Section 10.3 of the 2019, 2020, and 2022 Franchise Agreements requires each franchisee to "make monthly National Advertising Fund Contributions equal to two

percent (2%) of that month's Gross Sales," and provides that "[t]he National Advertising Fund shall be maintained and administered by Franchisor or its designee" subject to the requirements of Sections 10.3.1 through 10.3.5. Section 11.3 of the 2008 Franchise Agreement contains a parallel provision, subject to the requirements of Sections 11.3.1 through 11.3.5. *See* Ex. A, 2008 Franchise Agreement, § 11.3.

78.    Section 10.3.1 of the 2019 and 2020 Franchise Agreements provides that "[a]ll National Advertising Fund Contributions shall be maintained in a separate account from the monies of Franchisor and shall not be used to defray any of Franchisor's general operating expenses, except for such reasonable costs and expenses, if any, that Franchisor may incur in activities reasonably related to the administration of the National Advertising Fund." Ex. A, 2019 Franchise Agreement, § 10.3.1; 2020 Franchise Agreement, § 10.3.1. Section 11.3.1 of the 2008 Franchise Agreement is identical. *See* Ex. A, 2008 Franchise Agreement, § 11.3.1. Section 10.3.1 of the 2022 Franchise Agreement contains the same prohibition, with the exception expanded to include "the salaries of employees who manage marketing agencies, administer the National Advertising Fund, or directly create marketing materials or tools." Ex. A, 2022 Franchise Agreement, § 10.3.1.

79.    UFG's 2024 income statement, attached as an exhibit to its 2025 FDD, reflects that UFG paid $530,861.00 in corporate salaries from the National Advertising Fund, which constitutes over 50% of the total National Advertising Fund contributions collected in 2024 of approximately $1 million. Yet, UFG improperly represents elsewhere in its 2025 FDD that the monies in the 2024 National Advertising Fund were spent as follows:

> [i]n 2024, the Brand Fund contributions were spent as follows: 33.1% on business-to-consumer advertising, including the creation and distribution of consumer advertising, 31.3% on business-to-business advertising, including the creation, development, funding, and maintenance of national account programs, 9.1% on advertising tools, including tools to reach customers

19

FIRST AMENDED COMPLAINT FOR DAMAGES

through various platforms, and 26.5% on website hosting, development, maintenance, and optimization and the development of new online tools.

80. The $530,861.00 in corporate salaries UFG paid out of the National Advertising Fund in 2024 constituted the use of National Advertising Fund Contributions to defray UFG's general operating expenses, in direct contravention of Section 10.3.1 of the 2019, 2020, and 2022 Franchise Agreements and Section 11.3.1 of the 2008 Franchise Agreement. Those salaries were not "reasonable costs and expenses . . . incur[red] in activities reasonably related to the administration of the National Advertising Fund." Nor, as to the 2022 Franchise Agreement, were they salaries "of employees who manage marketing agencies, administer the National Advertising Fund, or directly create marketing materials or tools."

81. Plaintiffs' advertising contributions would be far better spent on improving UNITS' current website capabilities and the brand's overall online presence, both of which UFG claims to have devoted significant portions of the National Advertising Fund to but which remain severely lacking. In reality, and according to UFG's own financial statements, the majority of the National Advertising Fund has been used to pay for corporate salaries and annual conferences focused on building corporate relationships with third-party vendors, and for Mr. McAlhany's personal preferences and luxuries (i.e., VIP tickets to NASCAR events). When these improper expenditures have been brought to UFG's attention, franchisees' concerns have been met with resistance, hostility, and/or silence by UFG.

**F.    UFG's Exploitation of Plaintiffs' Marketing Leads and Retaliatory Disqualification**

82. In addition to contributing two percent (2%) of their monthly Gross Sales to the National Advertising Fund, Plaintiffs generate their own sales leads through their own paid advertising, including Google pay-per-click campaigns. UFG does not conduct meaningful lead-generation marketing for its franchisees. Plaintiffs, Bay Area, TAJ, and

20

So Cal, are separately required by Section 10.2 of the 2019, 2020, and 2022 Franchise Agreements, respectively, to spend a minimum of $3,000 each month on local advertising within their Protected Territory, escalating with revenue. Section 11.2 of the 2008 Franchise Agreement does not impose a minimum local advertising monthly spend requirement on NIMA.

83.    LDM occurs when a customer moves from one UNITS territory to another. UFG operates the LDM program but has no lead-generation source of its own for LDM business. Instead, UFG relies on the leads Plaintiffs generate and pay for: when a customer who finds a Plaintiff through Plaintiff's paid advertising requests a long-distance move, UFG requires the Plaintiff to route that lead to UFG, which then services the move and collects the revenue.

84.    Plaintiffs pay Google for every such click and inquiry, including the LDM inquiries they are required to hand over to UFG. UFG pays Plaintiffs nothing for these self-funded leads, even though UFG monetizes them—servicing the resulting moves and, in many cases, earning substantial revenue from a single lead the Plaintiff paid to generate. UFG has thus been enriched at Plaintiffs' expense, receiving for free the benefit of marketing that Plaintiffs funded.

85.    Neither the 2008 Franchise Agreement, the 2019 Franchise Agreement, nor the 2020 Franchise Agreement contains any provision addressing Long-Distance Moving, any obligation on the part of NIMA, Bay Area, or TAJ to participate in a Long-Distance Moving program, any obligation to route customer leads to UFG, or any allocation of Long-Distance Moving revenue. UFG's appropriation of the self-funded leads of NIMA, Bay Area, and TAJ is, therefore, governed by no contract term.

86.    As to So Cal, Section 12.15 of the 2022 Franchise Agreement provides only that UFG "reserves the right to require Franchisee to enter into Franchisor's designated form of Long-Distance Moving addendum or agreement, effective on notice to Franchisee," and that the franchisee "must enter into any such Long-Distance Moving

FIRST AMENDED COMPLAINT FOR DAMAGES

addendum or agreement." No Plaintiff, including So Cal, ever signed a Long-Distance Moving addendum or agreement, and UFG never gave notice requiring So Cal to do so before demanding participation. Section 12.15 does not authorize UFG to appropriate, without compensation, the customer leads Plaintiffs generated and paid for.

87. When UFG later attempted to compel participation by circulating a one-sided LDM agreement to all Plaintiffs, Plaintiffs refused to sign it. In response, UFG retaliated in two ways. First, when Plaintiffs declined to participate in LDM, UFG routed the resulting long-distance business to Plaintiffs' competitors—including a competitor in Plaintiffs' own territory that uses the identical Boxwell containers and Cardinal mules—and, on information and belief, supplied that competitor with UFG containers to service customers in Plaintiffs' territory. Second, UFG disqualified Plaintiffs from a system-wide royalty-rebate program for which at least one Plaintiff's location had otherwise qualified by meeting the program's performance benchmarks, deeming Plaintiffs "non-compliant" primarily because they did not participate in the non-mandatory LDM program.

88. UFG's conduct in routing long-distance business to a competitor operating within a Plaintiff's Protected Territory, and in supplying that competitor with UNITS containers to service customers within that territory, contravened Section 1.4 of the 2019, 2020, and 2022 Franchise Agreements and Section 2.4 of the 2008 Franchise Agreement, each of which provides that UFG "shall not establish and operate, nor license any party other than Franchisee to establish and operate, any UNITS® Business *or substantially similar business* within the protected area identified below ('Protected Territory'), during the term hereof."

89. All conditions precedent to bringing this action have been waived, excused, performed, or otherwise occurred.

90. As a result of UFG's untrue statements and omissions of material fact in its FDDs and UFG's material breaches of the Franchise Agreements, and Plaintiffs' need to protect and enforce their legal rights, Plaintiffs have retained the undersigned attorneys to

FIRST AMENDED COMPLAINT FOR DAMAGES

represent their interests and are obligated to pay them reasonable attorneys' fees and costs. Plaintiffs seek to recover their attorneys' fees and costs from UFG pursuant to applicable statutory law, including Cal. Corp. Code § 31304, and pursuant to Section 22.4 of the 2008 Franchise Agreement and Section 21.4 of the 2019, 2020, and 2022 Franchise Agreements as made reciprocal by operation of law.

## FIRST CAUSE OF ACTION

### Fraudulent Misrepresentation

### (In the Alternative to Counts II and V)

91.    Plaintiffs incorporate paragraphs 1 through 90, *supra*, as if fully set forth herein.

92.    As fully set forth in paragraphs 60 through 64, *supra*, throughout the franchise relationship, UFG had superior and, in material respects, exclusive knowledge of facts not reasonably discoverable by Plaintiffs, including that the UNITS containers and mules were off-the-shelf products manufactured by Havener, USC, Boxwell, and Cardinal, and sold to the public at materially lower prices, and that UFG resold those products to Plaintiffs at a concealed and excessive markup.

93.    UFG was under a duty to disclose those facts to Plaintiffs during the franchise relationship because (i) UFG had exclusive knowledge of material facts not known to or reasonably discoverable by Plaintiffs; (ii) UFG actively concealed those material facts from Plaintiffs; and (iii) UFG made partial representations to Plaintiffs during the relationship regarding the source and availability of the required equipment while suppressing material facts.

94.    As fully set forth in paragraphs 60 to 64, *supra*, UFG intentionally concealed and suppressed these facts. Among other things, UFG represented that there were "no alternate sources of supply," and directed its vendors (including Boxwell) not to communicate or transact directly with Plaintiffs and to redirect franchisee inquiries to UFG. UFG undertook these acts for the purpose of preventing Plaintiffs from discovering

the truth.

95. UFG's representations, made during the relationship, that there were no alternative sources of supply and that all purchasing had to route through UFG were false when made, and UFG knew they were false. UFG itself purchased the containers and mules directly from the manufactures, and UFG knew those vendors sold identical products to the general public and to UFG's competitors at materially lower prices.

96. UFG intended that Plaintiffs rely on its concealment by continuing to purchase containers, mules, trucks, and equipment exclusively through UFG at inflated prices, and by continuing to pay the fees and make the purchases required under the franchise relationship. Plaintiffs, ignorant of the concealed facts and unable to discover them through reasonable diligence given UFG's active concealment, did so rely.

97. UFG's concealment was material. Had Plaintiffs known the concealed facts, they would have purchased equipment from alternative sources at lower prices, would not have paid UFG's inflated markup, and would have made materially different business decisions.

98. As a direct and proximate result of UFG's fraudulent misrepresentations and active concealment of same, Plaintiffs have suffered damages, including the excessive amounts paid to UFG for non-proprietary equipment and related losses, in amounts to be proven at trial.

99. UFG's conduct was willful, wanton, malicious, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

### (In the Alternative to Counts I and V)

100. Plaintiffs incorporate paragraphs 1 through 90, *supra*, as if fully set forth herein.

101. In the course of the ongoing franchise relationship, and in connection with

FIRST AMENDED COMPLAINT FOR DAMAGES

Plaintiffs' continuing purchasing decisions, UFG made representations to Plaintiffs—including, through its officers and regional developers, that there were no alternative sources for the containers and equipment and that all purchasing had to route through UFG—that were false.

102.    UFG had a pecuniary interest in making these representations. As the party with superior and exclusive knowledge of the supply chain it controlled, and as the party contractually obligated under Section 12.2 of the 2019, 2020, and 2022 Franchise Agreements and Section 13.2 of the 2008 Franchise Agreement to supply that equipment at competitive prices, UFG owed Plaintiffs a duty to exercise reasonable care in communicating accurate information regarding the availability and source of the equipment Plaintiffs were required to purchase during the relationship.

103.    As fully set forth in paragraphs 60 to 64, *supra*, UFG breached that duty and failed to exercise reasonable care in communicating accurate information regarding the source and availability of the equipment Plaintiffs were required to purchase, the true information having been within UFG's own knowledge and control.

104.    Plaintiffs justifiably relied on UFG's representations in continuing to purchase equipment through UFG, and suffered pecuniary loss as a direct and proximate result, in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**

**Breach of Contract – National Advertising Fund**

105.    Plaintiffs incorporate paragraphs 1 through 90, *supra*, as though fully set forth herein.

106.    Each Plaintiff entered into a valid and binding Franchise Agreement with UFG, as identified in paragraphs 7 through 10, *supra*, for the operation of a UNITS franchised business.

107.    As fully set forth in paragraphs 76 through 81, *supra*, UFG breached Section 10.3.1 of the 2019, 2020, and 2022 Franchise Agreements and Section 11.3.1 of the 2008

Franchise Agreement by using National Advertising Fund Contributions for expenses not reasonably related to the administration of the National Advertising Fund, including using over 50% of the approximately $1 million in total contributions collected in 2024 on corporate salaries; using National Advertising Fund Contributions to pay for annual conferences focused on building UFG's corporate relationships with third-party vendors; and using National Advertising Fund Contributions to pay for personal preferences and luxuries, including VIP tickets to NASCAR events.

108.    As a direct and proximate result of the above-described breaches, Plaintiffs have suffered and continue to suffer financial damages, including the National Advertising Fund Contributions that UFG diverted to its own general operating expenses and to the personal benefit of its founder, in amounts to be proven at trial.

## FOURTH CAUSE OF ACTION

### Breach of Contract – Unreasonable Profit and Non-Competitive Pricing

109.    Plaintiffs incorporate paragraphs 1 through 90, *supra*, as though fully set forth herein.

110.    Each Plaintiff entered into a valid and binding Franchise Agreement with UFG, as identified in paragraphs 7 through 10, *supra*, for the operation of a UNITS franchised business.

111.    Plaintiffs performed their obligations under their respective Franchise Agreements.

112.    As fully set forth in paragraphs 44 through 48, *supra*, UFG breached Section 12.2 of the 2019, 2020, and 2022 Franchise Agreements and Section 13.2 of the 2008 Franchise Agreement by: (i) charging Plaintiffs prices for containers, mules, trailers, trucks, and other equipment that were not competitive; and (ii) earning a profit on the sale of equipment that was commercially unreasonable.

113.    As a direct and proximate result of the above-described breaches, Plaintiffs have suffered and continue to suffer financial damages, including the difference between

FIRST AMENDED COMPLAINT FOR DAMAGES

the prices UFG charged and the competitive prices at which the identical equipment was available, in amounts to be proven at trial.

### FIFTH CAUSE OF ACTION

### Breach of Contract Accompanied By A Fraudulent Act

### (In the Alternative to Counts I and II)

114.   Plaintiffs incorporate paragraphs 1 through 90, *supra*, as though fully set forth herein.

115.   Each Plaintiff entered into a valid and binding Franchise Agreement with UFG, as identified in paragraphs 7 through 10, *supra*, for the operation of a UNITS franchised business.

116.   Plaintiffs performed their obligations under their respective Franchise Agreements.

117.   UFG's breach was accompanied by fraudulent intent relating to the breach itself, and not merely to the making of the Franchise Agreements. As fully set forth in paragraphs 44 through 64, *supra*, throughout the franchise relationship, and each time it sold equipment to Plaintiffs, UFG knew that the prices it charged were not competitive and that its profit was not reasonable because UFG itself purchased the containers and mules directly from their respective manufacturers and knew the prices at which those manufacturers sold identical products to other purchasers.

118.   UFG intended to continue breaching its pricing obligations while preventing Plaintiffs from discovering the breach, for the purpose of preserving the concealed markup that the breach generated.

119.   As fully set forth in paragraphs 44 through 48, *supra*, UFG breached Section 12.2 of the 2019, 2020, and 2022 Franchise Agreements and Section 13.2 of the 2008 Franchise Agreement by: (i) charging Plaintiffs prices for containers, mules, trailers, trucks, and other equipment that were not competitive; and (ii) earning a profit on the sale of equipment that was commercially unreasonable.

FIRST AMENDED COMPLAINT FOR DAMAGES

120. UFG's breach was accompanied by fraudulent acts characterized by dishonesty in fact and unfair dealing. As fully set forth in paragraphs 44 through 64, *supra*, contemporaneously with and in furtherance of its ongoing breach, UFG intentionally concealed from Plaintiffs the true source of the equipment, its true market price, and the magnitude of UFG's markup. Each of these acts occurred during the contractual relationship, after each Plaintiff executed its Franchise Agreement, and accompanied UFG's breach of its pricing obligations.

121. As a direct and proximate result of UFG's breach of contract accompanied by fraudulent acts, Plaintiffs have suffered and continue to suffer financial damages, including the difference between the prices UFG charged and the competitive prices at which the identical equipment was available, in amounts to be proven at trial. Because UFG's breach was accompanied by fraudulent acts and undertaken with fraudulent intent, willfully, wantonly, and in reckless disregard of Plaintiffs' rights, Plaintiffs are further entitled to punitive damages.

**SIXTH CAUSE OF ACTION**

**Breach of Contract – Duty of Reasonableness and Good Faith and**

**Implied Covenant of Good Faith and Fair Dealing**

122. Plaintiffs incorporate paragraphs 1 through 90, *supra*, as though fully set forth herein.

123. Each Plaintiff entered into a valid and binding Franchise Agreement with UFG, as identified in paragraphs 7 through 10, *supra*, for the operation of a UNITS franchised business.

124. Plaintiffs performed their obligations under their respective Franchise Agreements.

125. The implied covenant of good faith and fair dealing is a term of each Franchise Agreement. Section 21.14 of the 2019, 2020, and 2022 Franchise Agreements and Section 22.14 of the 2008 Franchise Agreement expressly restate that covenant,

28

FIRST AMENDED COMPLAINT FOR DAMAGES

providing that "both Franchisor and Franchisee *shall* act reasonably and in good faith" in order to "honor the intent and purpose of [the Franchise] Agreement[s]."

126. The express duty imposed by Section 21.14 (Section 22.14 of the 2008 Franchise Agreement), and the implied covenant that provision restates, operate as terms of each Franchise Agreement and govern, among other things, the manner in which UFG exercises the discretion that the Franchise Agreements confer upon it, including its discretion under the following provisions of the Franchise Agreements:

   a. Section 9.2 of the 2019, 2020, and 2022 Franchise Agreements and Section 10.2 of the 2008 Franchise Agreement, which authorize UFG to "change or modify the System from time to time," including as to new or additional computer hardware and software, and to require Plaintiffs to make the expenditures that such changes "may reasonably require," as fully set forth in paragraphs 67 through 68, *supra*;

   b. Section 11.5 of the 2019, 2020, and 2022 Franchise Agreements and Section 12.5 of the 2008 Franchise Agreement, which require each Plaintiff to purchase and use the computer and point-of-sale system that UFG designates, and to pay a monthly software fee, as fully set forth in paragraph 65, *supra*;

   c. Section 10.3 of the 2019, 2020, and 2022 Franchise Agreements and Section 11.3 of the 2008 Franchise Agreement, which provide that the National Advertising Fund is to be maintained and administered by UFG or its designee, as fully set forth in paragraphs 76 through 81, *supra*;

   d. Section 12.2 of the 2019, 2020, and 2022 Franchise Agreements and Section 13.2 of the 2008 Franchise Agreement, which require each Plaintiff to order and purchase all of its requirements of UNITS Equipment exclusively from UFG, its Affiliate, or a supplier UFG designates, as fully set forth in paragraphs 44 through 48, *supra*; and

29

FIRST AMENDED COMPLAINT FOR DAMAGES

e.  Section 12.1 of the 2019, 2020, and 2022 Franchise Agreements and Section 13.1 of the 2008 Franchise Agreement, which commit to UFG the decision whether to approve an alternative supplier proposed by a franchisee, as fully set forth in paragraphs 49 through 59, *supra*.

127.  As fully set forth in paragraphs 44 through 88, *supra*, UFG breached Section 21.14 of the 2019, 2020, and 2022 Franchise Agreements and Section 22.14 of the 2008 Franchise Agreement and the implied covenant of good faith and fair dealing by failing to act reasonably and in good faith through its following actions:

a.  exercising its discretion under Section 9.2 of the 2019, 2020, and 2022 Franchise Agreements (Section 10.2 of the 2008 Franchise Agreement) and Section 11.5 of the 2019, 2020, and 2022 Franchise Agreements (Section 12.5 of the 2008 Franchise Agreement) to designate, and to mandate the systemwide implementation of, the StoreSmart POS system in the middle of the industry's peak season, with less than one month's notice, while knowing that the system had failed testing, contained numerous unresolved bugs and glitches, and might not be able to accommodate every franchisee, and thereafter continuing to charge excessive and duplicative fees for a system UFG knew did not work;

b.  exercising its discretion to maintain and administer the National Advertising Fund under Section 10.3 of the 2019, 2020, and 2022 Franchise Agreements (Section 11.3 of the 2008 Franchise Agreement) by directing the Fund's monies to UFG's corporate salaries, to its vendor-relationship conferences, and to the personal preferences and luxuries of its founder, rather than to advertising benefiting the franchise system;

c.  exercising its discretion under Section 12.2 of the 2019, 2020, and 2022 Franchise Agreements (Section 13.2 of the 2008 Franchise Agreement) to designate itself the exclusive source of non-proprietary equipment and

FIRST AMENDED COMPLAINT FOR DAMAGES

setting the prices Plaintiffs were required to pay, charging Plaintiffs non-competitive prices and extracting an unreasonable profit while concealing the true source and market price of that equipment;

d.  interfering with Plaintiffs' relationships with UFG's own approved vendors by instructing those vendors not to communicate or transact directly with Plaintiffs and to redirect franchisee inquiries to UFG, thereby depriving Plaintiffs of pricing information and of the ability to purchase at competitive prices;

e.  routing long-distance moving business generated by Plaintiffs' own paid advertising to Plaintiffs' competitors, including a competitor operating within a Plaintiff's Protected Territory, and supplying that competitor with UNITS containers to service customers within that territory; and

f.  disqualifying Plaintiffs from a systemwide royalty-rebate program for which at least one Plaintiff had otherwise qualified by meeting the program's performance benchmarks, on the pretextual ground that Plaintiffs were "non-compliant" for declining to participate in an LDM program that no Plaintiff was contractually obligated to join.

128.    UFG further breached Section 21.14 of the 2019, 2020, and 2022 Franchise Agreements and Section 22.14 of the 2008 Franchise Agreement, and the implied covenant those provisions restate, by withholding its consent in bad faith and in contravention of the intent and purpose of the Franchise Agreements.

129.    Approval of an alternative supplier under the Franchise Agreements is subject to UFG's discretion. UFG was, therefore, contractually prohibited from withholding that consent in bad faith; yet UFG required that all container and equipment purchasing route through UFG and represented to Plaintiffs that no alternative sources of supply existed, for the improper purpose of preserving UFG's concealed markup.

130.    As a direct and proximate result of UFG's breaches, Plaintiffs have suffered

FIRST AMENDED COMPLAINT FOR DAMAGES

and will continue to suffer substantial damages, including but not limited to: (i) lost profits and business opportunities; (ii) excessive costs for equipment, containers, and software; (iii) business disruption and operational losses caused by the defective StoreSmart system; (iv) wasted National Advertising Fund contributions; and (v) other financial damages to be proven at trial.

### SEVENTH CAUSE OF ACTION

**Violation of the California Franchise Investment Law,**

**California Corp. Code § 31202**

131.    Plaintiffs incorporate paragraphs 1 through 90, *supra*, as if fully set forth herein.

132.    It is unlawful for any person willfully to make any untrue statement of a material fact in any statement required to be disclosed in writing pursuant to Section 31101, or willfully to omit to state in any such statement any material fact which is required to be stated therein. Cal. Corp. Code § 31202.

133.    As fully set forth in paragraphs 16 through 21, *supra*, the FTC Franchise Rule, 16 C.F.R. § 436, sets forth comprehensive requirements for franchise disclosure documents, including twenty-three (23) categories of information that must be disclosed in the FDD. 16 C.F.R. § 436.5.

134.    UFG was required to make truthful disclosures in its FDDs pursuant to Cal. Corp. Code § 31101 and the FTC Franchise Rule.

135.    As fully set forth in paragraphs 23 through 26, *supra*, each Plaintiff received, and justifiably relied on, a specific UFG FDD before executing its Franchise Agreement.

136.    As fully set forth in paragraphs 22 through 39, *supra*, UFG willfully made untrue statements of material fact and willfully omitted to state material facts required to be disclosed in Items 1, 8, and 10 of the FDDs provided to Plaintiffs.

137.    As fully set forth in paragraphs 40 through 43, *supra*, UFG's untrue statements and omissions were material facts that were necessary to make UFG's

FIRST AMENDED COMPLAINT FOR DAMAGES

disclosures not misleading in light of the circumstances under which they were made.

138.    UFG made these untrue statements and omissions willfully, knowing they were false or with reckless disregard for their truth or falsity, for the purpose of inducing Plaintiffs to purchase UNITS franchises.

139.    As fully set forth in paragraphs 40 through 43, *supra*, Plaintiffs justifiably relied upon the accuracy and completeness of UFG's FDDs in making their decisions to invest in UNITS franchises.

140.    As fully set forth in paragraphs 60 through 63, *supra*, Plaintiffs did not discover, and in the exercise of reasonable diligence could not have discovered, the facts constituting UFG's violations because UFG affirmatively and fraudulently concealed those facts prior to and throughout the franchise relationship.

141.    As a direct and proximate result of UFG's violations of Cal. Corp. Code § 31202, Plaintiffs have suffered substantial pecuniary losses in amounts to be proven at trial.

142.    Pursuant to Cal. Corp. Code § 31304, Plaintiffs are entitled to recover reasonable attorneys' fees and costs incurred in connection with this action.

143.    Pursuant to Cal. Corp. Code § 31512, any condition, stipulation, or provision in the Franchise Agreements purporting to bind Plaintiffs to waive compliance with any provision of the CFIL is void as applied to this cause of action.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment—LDM

144.    Plaintiffs incorporate paragraphs 1 through 90, *supra*, as if fully set forth herein.

145.    As fully set forth in paragraphs 85 through 86, *supra*, none of the 2008, 2019, or 2020 Franchise Agreements contains any provision governing Long-Distance Moving, the routing of customer leads to UFG, the allocation of Long-Distance Moving revenue, or any obligation on the part of NIMA, Bay Area, or TAJ to participate in an

FIRST AMENDED COMPLAINT FOR DAMAGES

LDM program. UFG's appropriation of the self-funded customer leads of NIMA, Bay Area, and TAJ is, therefore, governed by no express contract term.

146.   Plaintiffs conferred a benefit upon UFG. As fully set forth in paragraphs 82 through 88, *supra*, Plaintiffs paid for and generated customer leads through their own paid advertising, including Google pay-per-click campaigns and the minimum monthly local advertising expenditures the Franchise Agreements required them to make. When a customer that a Plaintiff had acquired through that self-funded advertising requested a long-distance move, UFG required the Plaintiff to route that customer to UFG.

147.   UFG realized and appreciated that benefit. As fully set forth in paragraphs 82 through 84, *supra*, UFG has no lead-generation source of its own for Long-Distance Moving business. UFG serviced the resulting moves, collected the revenue from those moves directly from the customers, and in many cases earned substantial revenue from a single lead that a Plaintiff had paid to generate.

148.   UFG retained that benefit without paying Plaintiffs anything in return, under circumstances that make its retention inequitable. UFG accepted the fruits of marketing expenditures it did not make, for a service line from which Plaintiffs derived no compensation, while simultaneously collecting royalties and National Advertising Fund Contributions from Plaintiffs and providing no meaningful lead-generation marketing of its own. When Plaintiffs declined to continue participating on those terms, UFG routed the resulting business to Plaintiffs' competitors and stripped Plaintiffs of a royalty rebate they had earned.

149.   Plaintiffs are entitled to restitution of the value of the benefit UFG received, including the reasonable value of the customer leads UFG appropriated and the revenue UFG derived from them, in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, So Cal Storage, LLC, Bay Area Storage, LLC, NIMA Group LLC, and TAJ Units Holdings, LLC, pray for a judgment against Defendant UNITS

FIRST AMENDED COMPLAINT FOR DAMAGES

Franchising Group, Inc. as follows:

1.     For damages in an amount to be determined at trial;

2.     For restitution of all amounts improperly collected by UFG, including but not limited to excessive equipment and container costs, software and support fees, National Advertising Fund contributions diverted to UFG's general operating expenses, and the value of the customer leads UFG appropriated;

3.     For an award of reasonable attorneys' fees and costs incurred in connection with this action pursuant to Cal. Code Corp. § 31304 and Section 22.4 of the 2008 Franchise Agreement, and Section 21.4 of the 2019, 2020, and 2022 Franchise Agreements;

4.     For an award of pre-judgment interest at the maximum amount allowed by law from the date each cause of action accrued to the date of judgment;

5.     For an award of post-judgment interest at the maximum amount allowed by law;

6.     For punitive damages in an amount sufficient to punish UFG and deter future misconduct; and

7.     For such other and further relief as the Court deems just and proper.

## REQUEST FOR JURY TRIAL

Plaintiffs, So Cal Storage, LLC, Bay Area Storage, LLC, NIMA Group LLC, and TAJ Units Holdings, LLC hereby demand a trial by jury on all issues.

FIRST AMENDED COMPLAINT FOR DAMAGES

Date: August 7, 2026

Respectfully submitted,

**THE GHILEZAN LAW FIRM**
By:  /s/ R. Michael Ghilezan
R. MICHAEL GHILEZAN, Esq.

-and-

By: /s/ Himanshu M. Patel
**ROBERT ZARCO (FBN 502138)**
E-mail: rzarco@zarcolaw.com
**HIMANSHU M. PATEL (FBN 0167223)**
E-mail: hpatel@zarcolaw.com
E-mail: acoro@zarcolaw.com
**F. ALAINA RODRIGUEZ (FBN 1070046)**
E-mail: farodriguez@zarcolaw.com

Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2026, I electronically filed the foregoing document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail, electronic mail, or by other means permitted by the court rules.

By: /s/*Himanshu M. Patel*
Himanshu M. Patel, Esq.

36

FIRST AMENDED COMPLAINT FOR DAMAGES