UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SO CAL STORAGE, LLC; BAY AREA STORAGE, LLC; TAJ UNITS HOLDINGS, LLC; NIMA GROUP LLC; California limited liability companies,

Plaintiffs,

v.

UNITS FRANCHISING GROUP, INC., a South Carolina corporation,

Defendant.

Case No. 2:25-cv-10222-WLH-BFM

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT [58]**

The Court is in receipt of Defendant UNITS Franchising Group, Inc.'s Corrected Motion to Dismiss the First Amended Complaint ("Motion" or "Mot.," Dkt. No. 58), Plaintiffs' Opposition to the Motion to Dismiss ("Opposition" or "Opp.," Dkt. No. 60) and Defendant's Reply in Support of the Motion to Dismiss ("Reply," Dkt. No. 61).

The Court finds this matter appropriate for decision without oral argument, pursuant to Federal Rule of Civil Procedure 78 and Local Rule 7-15, and given that no party filed a written request for oral argument stating that an attorney with five years or less of experience would be arguing the matter. (*See* Standing Order at 16–17, Dkt. No. 23). For the reasons below, the Motion is **DENIED.** The Court hereby **VACATES** the hearing scheduled for October 2, 2026.

## I. BACKGROUND

### A. Factual Background

Plaintiffs So Cal Storage, LLC ("So Cal"), Bay Area Storage, LLC ("Bay Area"), NIMA Group LLC ("NIMA") and TAJ Units Holdings, LLC ("TAJ") are California limited liability companies that operate or operated franchises in Defendant UNITS Franchising Group, Inc.'s ("Defendant") moving and portable-storage franchise system. (FAC ¶¶ 7-11). NIMA entered into its Franchise Agreement with Defendant in 2008, Bay Area in 2019, TAJ in 2020 and So Cal in 2022. (*Id.* ¶¶ 7-10). Each Franchise Agreement is attached to the FAC. (*Id.* ¶¶ 7-10 & n.1; *see id.* Ex. A).

Before entering their respective Franchise Agreements, Plaintiffs received Defendant's Franchise Disclosure Documents ("FDDs"). (*Id.* ¶¶ 22-26). Bay Area received Defendant's 2019 FDD, TAJ received the 2020 FDD, NIMA received the 2008 FDD and So Cal received the 2022 FDD. (*Id.* ¶¶ 23-26). According to the FAC, those FDDs represented, among other things, that UNITS franchises operated according to a proprietary system involving proprietary or custom-built containers and equipment and that Defendant was the only approved supplier of certain equipment with no alternative sources of supply. (*Id.* ¶¶ 22-26). Plaintiffs allege that those

representations were false because the containers and related equipment were manufactured by third-party vendors who sold identical products to the public and Defendant's competitors. (*Id.* ¶¶ 27-32). Plaintiffs further allege that Defendant failed to adequately disclose revenue, markups and other consideration derived from required purchases and certain vendor and lender relationships. (*Id.* ¶¶ 34-39).

Plaintiffs allege that they relied on Defendant's representations concerning the proprietary nature of the UNITS system and the absence of alternate sources of supply in deciding to purchase their franchises. (*Id.* ¶¶ 40-43). They further allege that, had they known the allegedly concealed facts concerning the source, availability and pricing of the equipment and Defendant's vendor relationships, they would not have invested in the UNITS system or would have negotiated materially different terms. (*Id.*).

The parties' Franchise Agreements also govern Plaintiffs' purchases of UNITS equipment. Section 12.2 of the 2019, 2020 and 2022 Agreements and Section 13.2 of the 2008 Agreement provide, among other things, that Defendant will make designated UNITS equipment available at "competitive prices" while permitting Defendant and its affiliates to earn a "reasonable profit" on those sales. (*Id.* ¶¶ 44-46). Plaintiffs allege that Defendant required them to purchase containers and other equipment through Defendant or its designated suppliers at prices substantially exceeding those available directly from vendors. (*Id.* ¶¶ 47-48). The FAC alleges, by way of example, that one Plaintiff obtained identical Boxwell containers directly from Boxwell for approximately $800 less per container than Defendant had charged. (*Id.* ¶ 48).

The Franchise Agreements establish a process by which franchisees may propose alternative suppliers. (*Id.* ¶¶ 49-51). They also contain provisions stating that the parties shall act reasonably and in good faith and, where consent is required, shall not unreasonably withhold consent unless the matter is expressly committed to a party's sole discretion. (*Id.* ¶ 50). Plaintiffs allege that Defendant nevertheless

rejected proposed alternative suppliers, including proposals made as recently as late 2024, without applying the contractual criteria and required Plaintiffs to route equipment purchases through Defendant. (*Id.* ¶¶ 51-59). Plaintiffs further allege that Defendant instructed certain approved vendors not to transact or communicate directly with franchisees, which allegedly prevented Plaintiffs from learning the equipment's source, market price and Defendant's markup until late 2024 at the earliest. (*Id.* ¶¶ 60-64).

The FAC also challenges Defendant's implementation of a point-of-sale and customer-management system known as StoreSmart. Plaintiffs' Franchise Agreements authorize Defendant to modify the franchise system and require franchisees to use designated computer and point-of-sale systems. (*Id.* ¶¶ 65-68). According to the FAC, Defendant required franchisees to migrate to StoreSmart beginning in 2024 despite knowing of bugs and compatibility problems and provided franchisees less than one month's notice before the migration began. (*Id.* ¶¶ 68-69). Plaintiffs allege that StoreSmart generated billing, pricing, inventory and reporting errors and that franchisees submitted more than 2,000 support tickets concerning the software. (*Id.* ¶¶ 70-73). The FAC alleges that TAJ suffered losses exceeding $100,000 and that the other Plaintiffs ultimately abandoned their attempted migrations and continued using their prior software. (*Id.* ¶ 74).

Plaintiffs additionally challenge Defendant's administration of the National Advertising Fund ("NAF"). The Franchise Agreements require monthly contributions to the NAF equal to two percent of gross sales and authorize Defendant to administer the Fund subject to specified limitations. (*Id.* ¶¶ 76-78). Plaintiffs allege that Defendant's 2024 financial information reflects $530,861 in corporate salaries paid from approximately $1 million in NAF contributions and contend that certain salaries and other expenditures constituted general operating expenses prohibited by the Agreements. (*Id.* ¶¶ 79-81).

Finally, the FAC alleges that Plaintiffs separately paid to generate customer leads through local advertising, including Google pay-per-click campaigns. (*Id.* ¶¶ 82-84). Plaintiffs allege that when a customer sought a long-distance move ("LDM") between UNITS territories, Defendant required the customer lead to be routed to Defendant, which serviced the move and collected the resulting revenue without compensating Plaintiffs for the lead. (*Id.*). Plaintiffs allege that the 2008, 2019 and 2020 Franchise Agreements contain no provision requiring NIMA, Bay Area or TAJ to participate in a LDM program, transfer customer leads to Defendant or allocate LDM revenue. (*Id.* ¶ 85). As to So Cal, the 2022 Agreement contains a provision addressing LDM, but Plaintiffs allege that no separate LDM addendum contemplated by that provision was executed. (*Id.* ¶ 86).

Plaintiffs allege that subsequently Defendant attempted to compel participation by circulating a one-sided LDM agreement to all Plaintiffs and retaliated when Plaintiffs refused to sign it. (*Id.* ¶ 87). Plaintiffs allege that Defendant routed long-distance business to Plaintiffs' competitors and disqualified Plaintiffs from a system-wide royalty-rebate program. (*Id.*)

**B. <u>Procedural Background</u>**

Plaintiffs commenced this action on October 24, 2025. ("Complaint" or "Compl.," Dkt. No.1). The original Complaint asserted claims arising from alleged pre-sale representations and post-sale conduct concerning the UNITS system, equipment purchasing, software, LDM revenue and franchise disclosures, as well as claims concerning Defendant's administration of the NAF. (*See generally* Compl.).

On July 9, 2026, the Court granted Defendant's motion to dismiss the original Complaint. ("Prior Order," Dkt. No. 52). As relevant here, the Court first determined that South Carolina law governs Plaintiffs' common-law claims and California law governs their California statutory claims. (*Id.* at 8-10). The Court concluded that Plaintiffs' fraudulent and negligent misrepresentation claims were preempted by the California Franchise Investment Law ("CFIL") to the extent they rested on the same

pre-sale statements and omissions regulated by that statute because the original Complaint did not adequately distinguish the allegedly actionable oral or post-sale conduct from the written FDD representations. (*Id.* at 13-16).

The Court also dismissed Plaintiffs' contract claims. With respect to the software allegations, the Court concluded that Section 11.5 did not create a guarantee of software functionality or support and instead imposed obligations on Plaintiffs concerning the use of designated software. (*Id.* at 20-21). As to the NAF claim, the Court concluded that Plaintiffs had not identified a specific contractual provision allegedly breached by Defendant's expenditures. (*Id.* at 21-22).

The Court separately dismissed Plaintiffs' standalone claim for breach of the implied covenant of good faith and fair dealing. The Court explained that South Carolina law does not recognize the implied covenant as an independent cause of action separate from breach of contract and that the covenant may not be used to create contractual duties not expressly stated or fairly implied in the parties' agreement. (*Id.* at 22-23). Finally, the Court dismissed Plaintiffs' CFIL claim under Rule 9(b) because the original Complaint failed to identify which FDD each Plaintiff relied upon and when that reliance occurred. (*Id.* at 24-25).

The Court dismissed the claims without prejudice and granted Plaintiffs leave to amend. (*Id.* at 25). After an extension of the amendment deadline, Plaintiffs filed the operative First Amended Complaint on August 7, 2026. (Dkt. No. 55). The FAC asserts eight claims: (1) fraudulent misrepresentation; (2) negligent misrepresentation; (3) breach of contract concerning the NAF; (4) breach of contract concerning unreasonable profit and non-competitive pricing; (5) breach of contract accompanied by a fraudulent act; (6) breach of contract concerning the duty of reasonableness and good faith; (7) violation of the CFIL under California Corporations Code section 31202; and (8) unjust enrichment concerning LDM leads. (FAC ¶¶ 91-149).

Defendant thereafter filed the present Motion to Dismiss the FAC on August 22, 2026. (Dkt. No. 58). Plaintiffs filed their Opposition on September 11, 2026. (Dkt. No. 60). Defendant filed its Reply on September 18, 2026. (Dkt. No. 61).

**II. LEGAL STANDARD**

Defendant moves to dismiss Claims Three and Four under Rule 12(b)(6). Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570). The Court must construe the complaint in the light most favorable to the plaintiff, accept all allegations of material fact as true and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The Court is not required to accept as true legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding a Rule 12(b)(6) motion, the Court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *see also Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (indicating that a court may consider a document "on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's

claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion”).

## III. DISCUSSION

Defendant moves to dismiss all eight claims in the FAC and argues that Plaintiffs largely replead theories the Court previously rejected without curing the deficiencies identified in the Prior Order. (*See generally* Mot.). Plaintiffs respond that the FAC materially changes the operative allegations by identifying the particular FDD associated with each Plaintiff, separating pre-sale representations from alleged post-sale conduct, identifying specific contractual provisions governing the challenged conduct and pleading additional facts concerning Defendant’s pricing, vendor relationships, NAF expenditures, exercise of contractual discretion and use of Plaintiffs’ customer leads. (*See generally* Opp.).

The original Complaint was dismissed without prejudice and with leave to amend specifically so that Plaintiffs could attempt to correct the identified pleading deficiencies. (Prior Order at 25). The question presented by the current Motion is therefore whether the FAC plausibly states the claims now asserted under the governing substantive law and applicable pleading standards.

As discussed below, the Court concludes that the FAC cures the deficiencies material to the present Motion and plausibly states each of the eight claims asserted. Several of Defendant’s arguments may ultimately bear on the merits of Plaintiffs’ claims, but they do not establish at the pleading stage that the claims fail as a matter of law. The Court addresses each claim in turn.

### A. Claim I: Fraudulent Misrepresentation

Defendant moves to dismiss Claim I on the grounds that Plaintiffs have not pleaded fraud with particularity under Rule 9(b), have not alleged an actionable post-sale misrepresentation or concealment and cannot establish a duty to disclose under South Carolina law. (Mot. at 19-21; Reply at 3-5). The Court disagrees.

As an initial matter, the FAC's Claim I differs materially from the fraudulent-misrepresentation claim alleged in the original Complaint. The Court previously dismissed that claim because the alleged misrepresentations concerning the proprietary system, LDM revenue, proprietary software and FDD Item 19 fell within the scope of the CFIL and because the Complaint failed to distinguish between oral and written misrepresentations or separate pre-sale from post-sale conduct. (Prior Order at 14-16.) The FAC now alleges a narrower theory based on conduct occurring during the parties' ongoing franchise relationships after Plaintiffs executed their respective Franchise Agreements. (FAC ¶¶ 60-64, 92-98).

Specifically, Plaintiffs allege that Defendant concealed that the containers and mules Plaintiffs were required to purchase were manufactured by third parties, were available to the public at materially lower prices and were resold to Plaintiffs at a concealed markup. (FAC ¶¶ 60, 92). Plaintiffs further allege that Defendant continued to represent during the franchise relationship that there were no alternative sources of supply, required purchases to be routed through Defendant and instructed approved vendors, including Boxwell, not to communicate or transact directly with Plaintiffs and instead to redirect franchisee purchasing inquiries to Defendant. (FAC ¶¶ 61, 94-96).

According to the FAC, Plaintiffs did not discover the allegedly concealed facts until late 2024 at the earliest, after an apparent falling-out between Defendant and Boxwell caused Boxwell to disclose pricing information to Plaintiffs. (FAC ¶¶ 62-63). These allegations concern alleged post-sale conduct and therefore do not present the same preemption problem identified in the Court's prior Order. (See Prior Order at 14-16).

The Court also concludes, at this stage, that Plaintiffs have sufficiently alleged a duty to disclose. Under South Carolina law, a duty to disclose may arise in certain circumstances based on the relationship between the parties or the circumstances of the transaction. *See Jacobson v. Yaschik*, 249 S.C. 577, 585 (1967) (holding that the

duty to disclose may arise outside of a definite fiduciary relation "where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied").

Plaintiffs argue that such a duty existed here because Defendant possessed superior and exclusive knowledge of material facts that were not known to or reasonably discoverable by Plaintiffs and actively concealed those facts, including by directing its vendors not to communicate or transact directly with Plaintiffs. (Opp. at 7; FAC ¶¶ 60-64, 92-94). Plaintiffs further allege that Defendant controlled the supply chain, knew the identity of the actual manufacturers and the prices at which they sold the same equipment to others and took affirmative steps to prevent Plaintiffs from obtaining that information. (FAC ¶¶ 60-63). At the pleading stage, those allegations are sufficient to plausibly allege circumstances giving rise to a duty to disclose under South Carolina law. See *Jacobson*, 249 S.C. at 586-87.

Defendant's reliance on the Franchise Agreements does not compel a different result. The agreements provide that Defendant and its affiliates may derive and retain "volume rebates, markups, and other benefits" from suppliers or in connection with sales of products and services. (FAC, Ex. A, 2019 Franchise Agreement § 12.1; 2020 Franchise Agreement § 12.1; 2022 Franchise Agreement § 12.1). But the agreements also provide that Defendant "commits to provide the UNITS® Equipment at competitive prices" and may earn only a "reasonable profit" on the sale of that equipment. (FAC ¶¶ 44-46; Ex. A, 2008 Franchise Agreement § 13.2; 2019 Franchise Agreement § 12.2; 2020 Franchise Agreement § 12.2; 2022 Franchise Agreement § 12.2).

Thus, although Plaintiffs were on notice that Defendant could earn markups or other benefits, the agreements do not establish as a matter of law that Plaintiffs knew the alleged magnitude of Defendant's markup, the identity of the manufacturers, the

prices available directly from those manufacturers or Defendant's alleged instructions preventing those manufacturers from dealing directly with Plaintiffs. (FAC ¶¶ 60-64). Those disclosures may bear on materiality and justifiable reliance, but they do not foreclose Plaintiffs' concealment theory at the pleading stage.

The Court further concludes that Claim I satisfies Rule 9(b). Rule 9(b) requires a plaintiff to plead the "who, what, when, where, and how" of the alleged fraudulent conduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106-07 (9th Cir. 2003). In cases involving nondisclosure, however, the particularity inquiry necessarily accounts for the nature of the alleged omission because a plaintiff cannot identify the time and place of a statement that was never made. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126-27 (9th Cir. 2009).

Here, the FAC identifies what Defendant allegedly concealed: the identity of the actual manufacturers, the availability of the same equipment to other purchasers at materially lower prices and the magnitude of Defendant's markup. (FAC ¶¶ 60, 92-95). It identifies how Defendant allegedly concealed those facts: by requiring equipment purchases to pass through Defendant, representing that no alternate sources existed and directing vendors such as Boxwell not to communicate or transact directly with Plaintiffs. (FAC ¶¶ 52, 54, 61, 94-96). It alleges why those representations were false: Defendant itself purchased the equipment from third-party manufacturers that allegedly sold identical products to the public and Defendant's competitors. (FAC ¶¶ 28-32, 60-61, 95). It also identifies the relevant period as the ongoing franchise relationship, culminating in Plaintiffs' alleged discovery of the concealed information in late 2024 after Boxwell began dealing transparently with Plaintiffs. (FAC ¶¶ 60-63). Finally, Plaintiffs allege that they relied on the concealment by continuing to purchase required equipment through Defendant at inflated prices and that they would instead have purchased equipment from alternative sources had the allegedly concealed information been disclosed. (FAC ¶¶ 64, 96-98.)

Defendant emphasizes that the FAC frequently refers collectively to "Plaintiffs" rather than identifying each Plaintiff separately. (Mot. at 18-20; Reply at 2-4). The cases on which Defendant relies require allegations sufficient to place a defendant on notice of the alleged fraudulent conduct attributed to that defendant. *See Vess*, 317 F.3d at 1106-07; *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (per curiam). This case, however, involves a single Defendant, and the FAC identifies each Plaintiff, the year in which each entered its Franchise Agreement and the FDD each allegedly received. (FAC ¶¶ 7-10, 23-26). More importantly for Claim I, the alleged fraudulent course of conduct is specifically identified as Defendant's post-sale concealment of the source, availability and pricing of equipment that each Plaintiff allegedly was required to purchase through Defendant. (FAC ¶¶ 60-64, 92-98). At this stage, those allegations provide Defendant sufficient notice of the conduct underlying Claim I to permit it to prepare a defense.

Accordingly, accepting the FAC's factual allegations as true and drawing reasonable inferences in Plaintiffs' favor, the Court concludes that Plaintiffs have sufficiently pleaded their fraudulent-misrepresentation claim. The Court therefore **DENIES** Defendant's Motion as to Claim I.

### B. Claim II: Negligent Misrepresentation

Defendant also moves to dismiss Claim II, Plaintiffs' claim for negligent misrepresentation. (Mot. at 20-21). Defendant argues that Claim II fails to satisfy Rule 9(b) and does not sufficiently allege an actionable post-sale misrepresentation or duty to disclose. (*Id.*; Reply at 3-5). Under South Carolina law, a claim for negligent misrepresentation requires that "(1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation." *Quail*

*Hill, LLC v. County of Richland*, 387 S.C. 223, 240 (2010). The FAC sufficiently alleges those elements.

Plaintiffs allege that, during the ongoing franchise relationship, Defendant represented through its officers and regional developers that there were no alternative sources for the containers and equipment and that all purchasing had to be routed through Defendant. (FAC ¶ 101). Plaintiffs allege that those representations were false because the equipment was manufactured by third parties that sold the same products to others at materially lower prices. (FAC ¶¶ 28-32, 60, 101). Plaintiffs further allege that Defendant had a pecuniary interest in the representations because it sold the equipment Plaintiffs were required to purchase and profited from those sales. (FAC ¶¶ 47-48, 96, 102). According to the FAC, Defendant possessed superior knowledge of the supply chain it controlled and failed to exercise reasonable care in communicating accurate information concerning the source and availability of the equipment. (FAC ¶¶ 60-64, 102-103). Plaintiffs allege that they relied on those representations by continuing to purchase equipment through Defendant and suffered pecuniary loss as a result. (FAC ¶¶ 96-98, 104).

Defendant argues that Plaintiffs have not alleged a duty of care independent of the Franchise Agreements. (Mot. at 20-21; Reply at 5). South Carolina law, however, recognizes that "[w]here a person has a pecuniary interest in making a statement, he owes a duty of care to see that he communicates truthful information to the listener." *Quail Hill*, 387 S.C. at 240; see also *Schnellmann v. Roettger*, 368 S.C. 17, 20-21 (Ct. App. 2006). Plaintiffs expressly allege that Defendant had a pecuniary interest in the challenged representations because it sold the equipment Plaintiffs were required to purchase and profited from those transactions. (FAC ¶ 102). At the pleading stage, those allegations sufficiently allege the duty required for negligent misrepresentation.

Defendant's Rule 9(b) argument likewise does not warrant dismissal. Although fraud is not an element of negligent misrepresentation under South Carolina law, Rule 9(b) applies to averments of fraud even when fraud is not an essential element of the

asserted claim. *Vess*, 317 F.3d at 1103-05. Here, Claim II incorporates the same alleged representations and course of conduct underlying Claim I. (FAC ¶¶ 100-104). (FAC ¶¶ 28-32, 52, 54, 60-64, 101-104). Accordingly, to the extent Rule 9(b) applies to the allegations underlying Claim II, those allegations are sufficiently particularized.

Nor does the Court's prior preemption ruling require dismissal. The Court previously dismissed Claim II because the original Complaint failed to distinguish the alleged oral misrepresentations from the written FDD representations regulated by the CFIL and premised Claim II on the same categories of pre-sale representations underlying the CFIL claim. (Prior Order at 14-16). The FAC now bases Claim II on representations allegedly made during the ongoing franchise relationship concerning the source and availability of equipment Plaintiffs continued to purchase from Defendant. (FAC ¶¶ 60-64, 101-104). To the extent Claim II rests on those alleged post-sale representations, it is not subject to the preemption rationale identified in the Prior Order.

Accordingly, the Motion is **DENIED** as to Claim II.

### C. Claim III: Breach of Contract, NAF Contributions

Defendant moves to dismiss Claim III, which alleges breach of contract based on Defendant's use of NAF contributions. (Mot. at 22). Under South Carolina law, a breach of contract claim requires a binding contract, breach or unjustifiable failure to perform and damages resulting from the breach. *King v. Carolina First Bank*, 26 F. Supp. 3d 510, 517 (D.S.C. 2014). The Court previously dismissed Plaintiffs' NAF claim because Plaintiffs failed to identify a contractual provision governing Defendant's use of NAF contributions. (Prior Order at 21-22). The FAC cures that deficiency. It identifies Section 10.3.1 of the 2019 and 2020 Franchise Agreements and Section 11.3.1 of the 2008 Franchise Agreement, which provide that NAF contributions "shall not be used to defray any of Franchisor's general operating expenses," except for reasonable costs and expenses related to administration of the NAF. (FAC ¶ 78). The 2022 Franchise Agreement contains the same prohibition but

additionally permits payment of salaries to employees who manage marketing agencies, administer the NAF or directly create marketing materials or tools. (*Id.*).

Plaintiffs further allege that Defendant's 2024 income statement reflects payment of $530,861 in corporate salaries from the NAF, representing more than half of the approximately $1 million in contributions collected that year. (FAC ¶ 79). Plaintiffs allege that those salaries were general operating expenses and did not fall within the contractual exceptions, including the additional salary exception contained in the 2022 Franchise Agreement. (FAC ¶ 80). They also allege that Defendant used NAF contributions for conferences focused on Defendant's vendor relationships and for personal expenditures, including VIP tickets to NASCAR events. (FAC ¶¶ 81, 107). Plaintiffs allege resulting damages consisting of NAF contributions diverted to Defendant's general operating expenses and personal expenditures. (FAC ¶ 108).

Defendant contends that the allegation of "corporate salaries" does not establish that the salaries were prohibited rather than permissible NAF-related expenses. (Mot. at 22; Reply at 5-6). But at the pleading stage, the Court accepts Plaintiffs' well-pleaded factual allegations as true and draws reasonable inferences in their favor. Plaintiffs do not merely allege that Defendant paid corporate salaries from the NAF; they specifically allege that those salaries constituted general operating expenses and did not fall within the contractual exceptions. (FAC ¶¶ 79-80). Whether the employees whose salaries were paid from the NAF actually performed functions falling within those exceptions presents a factual question not appropriately resolved on a motion to dismiss.

Accordingly, Plaintiffs have cured the deficiency identified in the Court's prior Order and plausibly alleged a breach of the provisions governing the NAF. The Motion is **DENIED** as to Claim III.

**D. Claim IV: Breach of Contract, Unreasonable Profit and Non-Competitive Pricing**

Defendant moves to dismiss Claim IV, which alleges that Defendant breached the Franchise Agreements by charging non-competitive prices and earning an unreasonable profit on required equipment purchases. (Mot. at 22-23). Sections 12.2 of the 2019, 2020 and 2022 Franchise Agreements and Section 13.2 of the 2008 Franchise Agreement provide that Defendant will furnish UNITS Equipment at "competitive prices" while permitting Defendant and its affiliates to earn a "reasonable profit" on those sales. (FAC ¶¶ 44-46, 110-112).

The FAC plausibly alleges a breach of those provisions. Plaintiffs allege that Defendant required them to purchase containers, mules, trailers, trucks and other equipment exclusively through Defendant or its designated suppliers at prices that were not competitive and yielded Defendant an unreasonable profit. (FAC ¶ 47). More specifically, Plaintiffs allege that one Plaintiff purchased identical Boxwell containers directly for approximately $800 less per container than Defendant charged and that, on information and belief, Defendant's markup on Boxwell containers was the highest markup Boxwell applied to any customer. (FAC ¶ 48). Plaintiffs allege resulting damages consisting of the difference between Defendant's prices and the competitive prices at which identical equipment was available. (FAC ¶ 113).

Defendant argues that the $800 differential does not plausibly establish either a non-competitive price nor an unreasonable profit because the FAC does not identify the particular plaintiff, Defendant's price or cost or the terms of the respective transactions. (Mot. at 22-23; Reply at 6-7). Those arguments may bear on whether Plaintiffs ultimately can establish a breach, but they demand greater factual detail than necessary at the pleading stage.

Plaintiffs allege a concrete price differential for identical goods and expressly allege that Defendant's markup was unusually high. (FAC ¶ 48). Accepting those allegations as true, the Court can reasonably infer that Defendant may have charged

prices inconsistent with its contractual obligation to provide equipment at competitive prices and earn only a reasonable profit. Whether the transactions were in fact comparable and whether the resulting prices and profits were competitive and reasonable present factual questions that cannot be resolved on the pleadings.

Accordingly, the Motion is **DENIED** as to Claim IV.

### E. <u>Claim V: Breach of Contract Accompanied by a Fraudulent Act</u>

Defendant moves to dismiss Claim V for breach of contract accompanied by a fraudulent act. (Mot. at 23-24). Under South Carolina law, such a claim requires "(1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract; and (3) a fraudulent act accompanying the breach." *Conner v. City of Forest Acres*, 348 S.C. 454, 465-66 (2002). The fraudulent act must be distinct from the breach itself. See *Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198, 202-03 (4th Cir. 1988).

Plaintiffs sufficiently allege each element. As discussed above, the FAC plausibly alleges that Defendant breached its contractual obligation to provide equipment at competitive prices while earning only a reasonable profit. (FAC ¶¶ 44-48, 112, 119). Plaintiffs further allege that Defendant knew its prices were not competitive and its profits were unreasonable because Defendant itself purchased the equipment from the manufacturers and knew the prices at which identical products were sold to others. (FAC ¶¶ 117-118). Plaintiffs allege that, contemporaneously with the alleged pricing breach, Defendant concealed the true source and market price of the equipment and the magnitude of its markup, including by directing vendors not to communicate or transact directly with Plaintiffs. (FAC ¶¶ 60-63, 120).

Defendant argues that the alleged concealment is not separate from the contractual breach and is not pleaded with particularity. (Mot. at 23-24; Reply at 7-8). The Court disagrees. The alleged breach is Defendant's charging of non-competitive prices and earning of an unreasonable profit, while the alleged fraudulent acts concern Defendant's separate efforts to conceal the source, market price and markup of the

equipment while the alleged breach continued. (FAC ¶¶ 117-120). The alleged concealment therefore is not merely the contractual nonperformance itself. Moreover, for the reasons discussed as to Claim I, the FAC sufficiently pleads the alleged concealment under Rule 9(b).

Accordingly, the Motion is **DENIED** as to Claim V.

**F. Claim VI: Breach of Contract, Duty of Reasonableness and Good Faith**

Defendant moves to dismiss Plaintiffs' Sixth Claim for breach of contract, arguing that the claim merely repackages the independent implied-covenant claim the Court previously dismissed and attempts to impose obligations not contained in the Franchise Agreements. (Mot. at 24-25). Plaintiffs respond that Claim Six differs from the prior claim because it is expressly pleaded as a breach-of-contract claim based on contractual provisions requiring the parties to act reasonably and in good faith in exercising rights and discretion under the Agreements. (Opp. at 12-13).

The Court previously concluded that, under South Carolina law, the implied covenant of good faith and fair dealing "may not be relied on to create new contractual duties not expressly stated or fairly implied in the contract itself." (Prior Order at 22) (quoting *Road, LLC v. Beaufort Cnty.*, 443 S.C. 11, 24 (2024)). The Court further concluded that the implied covenant is not an independent cause of action separate from breach of contract and therefore dismissed Plaintiffs' former standalone implied-covenant claim. (Prior Order at 22-23); *see also Hall v. UBS Fin. Servs. Inc.*, 435 S.C. 75, 86 (2021) (explaining that where a contracting party alleges breach of the implied covenant, "the cause of action is simply one for breach of contract"); *RoTec Servs., Inc. v. Encompass Servs., Inc.*, 359 S.C. 467, 472-73 (Ct. App. 2004).

The FAC cured the prior deficiency. It does not plead Claim Six as an independent cause of action divorced from the Agreements. It pleads breach of contract and identifies Section 21.14 of the 2019, 2020 and 2022 Franchise Agreements and Section 22.14 of the 2008 Franchise Agreement, which allegedly

provide that "both Franchisor and Franchisee shall act reasonably and in good faith" and further restrict the unreasonable withholding of consent unless consent is expressly committed to a party's sole discretion. (FAC ¶¶ 50, 122-26).

Plaintiffs allege that these provisions govern Defendant's exercise of discretion under specific contractual provisions concerning modifications to the franchise system, designated software, administration of the NAF, required equipment purchases and approval of alternative suppliers. (*Id.* ¶ 126(a)-(e)). Thus, unlike the claim addressed in the Prior Order, Claim Six treats the duty of good faith as a contractual term governing how Defendant exercises rights and performs duties conferred by the Agreements. (*Id.* ¶¶ 125-29). That theory is consistent with South Carolina law. *See Road*, 443 S.C. at 24 (explaining that the implied covenant governs "the manner in which parties to a contract enforce their existing contractual rights and carry out their existing contractual duties").

At least some of Plaintiffs' allegations plausibly state such a claim. The FAC alleges that the Agreements establish a procedure under which Plaintiffs may propose alternative suppliers and commit the approval decision to Defendant. (FAC ¶¶ 49-51). Plaintiffs further allege that they proposed alternative suppliers, including most recently in late 2024, but Defendant categorically required all container and equipment purchases to pass through Defendant and rejected alternatives without explanation or application of the contractual criteria. (*Id.* ¶¶ 51-55). Claim Six alleges that Defendant exercised that contractual discretion in bad faith to preserve its allegedly concealed markup and thereby breached the Agreements' express reasonableness and good-faith provision. (*Id.* ¶¶ 128-29).

Defendant is correct that the covenant cannot prohibit conduct expressly authorized by a contract. *See Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277-78 (1995). But Plaintiffs do not merely allege that Defendant exercised an unconditional contractual right. They allege that the Agreements themselves govern the manner in which Defendant must exercise its discretion and withhold consent and that Defendant

exercised that discretion contrary to those contractual limitations. (FAC ¶¶ 50-59, 125-29). Whether Plaintiffs ultimately can establish that Defendant acted unreasonably or in bad faith is not properly resolved on the pleadings.

The Court's prior determination concerning Section 11.5 does not compel a different result. The Court previously held that Section 11.5 did not itself guarantee software functionality or support. (Prior Order at 20-21). Claim Six does not alter that contractual language. Rather, the claim alleges that Defendant exercised discretion conferred elsewhere in the Agreements, including the authority to modify the franchise system and designate required software, in a manner inconsistent with the contractual duty of reasonableness and good faith. (FAC ¶¶ 126-27). At this stage, the Court need not determine whether each alleged exercise of discretion identified in paragraph 127 independently states a breach because the alternative-supplier allegations are sufficient to permit Claim Six to proceed.

Accordingly, the Motion is **DENIED** as to Claim Six.

**G. <u>Claim VII: Violation of the California Franchise Investment Law</u>**

Defendant next moves to dismiss Plaintiffs' Seventh Claim under California Corporations Code section 31202. (Mot. at 25-27). Defendant principally argues that the FAC still fails to satisfy Rule 9(b), that the challenged statements and omissions are not actionable under section 31202 and that Plaintiffs have not plausibly alleged reasonable reliance. (*Id.*).

Section 31202 makes it unlawful willfully to make an untrue statement of material fact in a written statement required to be disclosed pursuant to section 31101 or willfully to omit a material fact required to be stated therein. Cal. Corp. Code § 31202. The Court previously concluded that a section 31202 claim sounding in fraud must satisfy Rule 9(b) and dismissed Plaintiffs' prior claim because Plaintiffs failed to identify "which FDDs each Plaintiff relied on and when each Plaintiff relied on those statements." (Prior Order at 24-25).

The FAC cures that deficiency. It identifies each Plaintiff's Franchise Agreement and the date on which that Plaintiff entered the franchise relationship. (FAC ¶¶ 7-10). It then identifies the corresponding disclosures Defendant provided via FDD to each Plaintiff before execution: the 2019 FDD for Bay Area, the 2020 FDD for TAJ, the 2008 FDD for NIMA and the 2022 FDD for So Cal. (*Id.* ¶¶ 23-26). The FAC identifies the challenged provisions of those disclosures as Items 1, 8 and 10 and quotes or describes the representations alleged to be false or misleading. (*Id.* ¶¶ 22-39, 135-39).

Among other things, Plaintiffs allege that the FDDs represented that UNITS businesses operated according to a "proprietary system," described the containers as "proprietary" and "custom built" and represented that Defendant was the only approved supplier and that there were "no alternate sources of supply." (*Id.* ¶¶ 22-26). Plaintiffs allege those statements were false because the containers and mules were manufactured by third-party vendors that sold identical products to the general public and Defendant's competitors and that Defendant knew those facts because it purchased the products from those vendors. (*Id.* ¶¶ 27-32). Plaintiffs further allege that each Plaintiff relied on those representations and omissions in deciding to invest and would not have invested or would have negotiated materially different terms had the allegedly concealed facts been disclosed. (*Id.* ¶¶ 40-43, 135, 139).

Those allegations provide substantially more particularity than the allegations addressed in the Prior Order. They identify the particular FDD associated with each Plaintiff, the relevant disclosure Items, the substance of the challenged representations, when the representations preceded each Plaintiff's franchise purchase and why Plaintiffs contend the representations were false. (FAC ¶¶ 7-10, 22-43, 135-39). Rule 9(b) does not require Plaintiffs to plead evidence, and the allegations are sufficiently particular to permit Defendant to identify the alleged misconduct and defend against it.

Defendant also argues that the FDDs adequately disclosed Defendant's ability to derive revenue, retain rebates and markups and require purchases from approved suppliers. (Mot. at 26-27). But those disclosures do not necessarily resolve the alleged falsity of the separate representations that the equipment and system were proprietary, that the containers were custom built or that no alternative sources of supply existed. (FAC ¶¶ 22-39). Nor does a contractual provision permitting Defendant to earn a "reasonable profit" necessarily disclose that, as Plaintiffs allege, identical equipment was available from the same manufacturers to the public and competitors at materially lower prices. (*Id.* ¶¶ 28-32, 44-48). At the pleading stage, the Court cannot conclude that the written disclosures necessarily supplied the facts Plaintiffs allege were misstated or concealed.

The FAC also alleges that Defendant's disclosures under Items 8 and 10 were false or misleading Plaintiffs allege that Item 8 required disclosure of whether Defendant derived revenue or other material consideration from required purchases, including the basis for payments from designated suppliers. (FAC ¶¶ 19, 34). Plaintiffs allege that Defendant understated the revenue, rebates, markups and other consideration it derived and failed to disclose the basis for payments received through certain vendor relationships. (*Id.* ¶¶ 36-39).

Plaintiffs further allege that Defendant's Item 10 disclosure was false or misleading because it failed to disclose financing relationships and whether the franchisor or an affiliate received consideration for placing financing with a lender. (FAC ¶¶ 20, 38). Plaintiffs allege that Defendant represented "it do[es] not offer direct or indirect financing" but failed to disclose material consideration that it received from Live Oak Bank, a lender Defendant steered franchisees to use for financing, who Defendant had a lending/lease relationship with. (*Id.* ¶¶ 35, 38).

Whether Plaintiffs ultimately can prove those allegations presents a question beyond the pleadings. Because the FAC adequately pleads at least one actionable

theory under section 31202, the Court need not determine at this stage whether every alleged Item 8 or Item 10 omission independently supports liability.

Accordingly, the Motion is **DENIED** as to Claim Seven.

### H. Claim VIII: Unjust Enrichment

Defendant moves to dismiss Plaintiffs' Eighth Claim for unjust enrichment arising from Defendant's alleged use of Plaintiffs' self-funded customer leads for LDMs. (Mot. at 27-29). Defendant argues that the Franchise Agreements govern the subject matter of the alleged benefit and therefore foreclose quasi-contractual relief. (*Id.* at 27-28). Plaintiffs respond that the relevant benefit is not LDM revenue generally, but the value of customer leads Plaintiffs allegedly generated at their own expense and were required to route to Defendant without compensation. (Opp. at 16-18).

Under South Carolina law, unjust enrichment requires "(1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value." *Columbia Wholesale Co. v. Scudder* May N.V., 312 S.C. 259, 261 (1994). An unjust-enrichment claim is quasi-contractual and permits relief where no enforceable contract exists or the alleged harm falls outside the scope of an existing contract. *Thompson v. Killian*, 447 S.C. 177, 193 (2025).

The FAC sufficiently alleges the elements of unjust enrichment. Plaintiffs allege that they paid for and generated customer leads through their own advertising, including Google pay-per-click campaigns, and that when those customers sought LDMs Defendant required Plaintiffs to route the customers to Defendant. (FAC ¶¶ 82-84, 146). Plaintiffs allege that Defendant had no independent lead-generation source for its LDM business but serviced the resulting moves and collected the resulting revenue. (*Id.* ¶¶ 83-84, 147). Plaintiffs further allege that Defendant retained the benefit of those self-funded leads without compensating Plaintiffs. (*Id.*

¶¶ 84, 148-49). Taken as true, those allegations plausibly allege a benefit conferred on Defendant, Defendant's realization of that benefit and circumstances under which retention without payment could be inequitable.

The closer question is whether the Franchise Agreements govern that alleged benefit. As to NIMA, Bay Area and TAJ, the FAC alleges that the 2008, 2019 and 2020 Franchise Agreements contain no provision governing LDM, routing customer leads to Defendant or allocating LDM revenue. (FAC ¶¶ 85, 145). Defendant points to broader provisions governing the UNITS system, transportation, advertising and alternative channels of distribution and argues that the leads necessarily fall within the contractual franchise relationship. (Mot. at 27-28). The existence of contractual provisions touching related subjects, however, does not establish from the pleadings that the Agreements govern the particular benefit for which restitution is sought: here, the value of Plaintiffs' allegedly self-funded leads transferred to Defendant without compensation.

So Cal's 2022 Franchise Agreement presents a closer question because it expressly addresses LDM. (FAC ¶ 86; Opp. at 17-18). According to the FAC and the Agreement attached thereto, Section 12.15 permits Defendant to require the franchisee to enter a designated LDM addendum or agreement and addresses Defendant's provision of LDM services, rates and collection and remittance of customer payments. (FAC ¶ 86 & Ex. A, 2022 Franchise Agreement § 12.15). Plaintiffs allege, however, that no such addendum was executed and that Defendant never provided the contemplated notice requiring So Cal to execute one. (FAC ¶ 86). More importantly, Plaintiffs contend that Section 12.15 governs performance and payment for the moving service, while the benefit alleged in Claim Eight is the preceding customer lead that So Cal paid to generate and transferred to Defendant without compensation. (FAC ¶¶ 82-86, 146-49; Opp. at 17-18).

The Court does not conclude at this stage that the customer leads necessarily fall outside the Franchise Agreements. Defendant may ultimately establish that the

Agreements govern the alleged benefit and thereby foreclose quasi-contractual recovery. But the contractual provisions Defendant identifies do not establish that proposition as a matter of law from the pleadings. See *Thompson*, 447 S.C. at 193. The distinction between the LDM services themselves and the independently funded customer leads is sufficiently plausible to permit the alternative unjust-enrichment theory to proceed at this stage. See Fed. R. Civ. P. 8(d)(2)-(3).

Defendant additionally alleges that Plaintiffs have contradicted themselves and that their Complaint alleged that the Franchise Agreements covered long distance moving but the FAC retracts that. (Mot. at 28). The Court disagrees.

Although the Court may consider allegations in a superseded pleading when evaluating whether an amended complaint contradicts an earlier pleading, *see Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 297-97 (9th Cir. 1990), the allegations identified by Defendant are not materially inconsistent. The Complaint alleged that a representation concerning LDM was consistent with the terms of the "Franchise Agreements," while citing only the 2022 agreement between So Cal and Defendant. (Compl. ¶ 18). The FAC clarifies that the other three franchise agreements contained no provisions governing LDM. (FAC ¶ 85). At most, the difference reflects the Complaint's imprecise use of the plural "Agreements," not a change in the underlying factual allegations.

Nor does the FAC contradict the Complaint by providing additional detail concerning the So Cal agreement. The FAC alleges that the agreement permitted Defendant to enter into an LDM moving addendum upon notice, but that no such addendum was executed and Defendant did not provide the required notice before demanding participation. (FAC ¶ 86). Those additional allegations elaborate on the contractual relationship alleged in the Complaint rather than contradict it. Accordingly, the Court declines to disregard the FAC's allegations on this basis.

The contractual documents themselves control the scope of the parties' contractual obligations, and Defendant has not shown on the present pleadings that they necessarily govern compensation for the specific customer leads at issue.

Accordingly, the Motion is **DENIED** as to Claim Eight.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss the First Amended Complaint is **DENIED**. Defendant shall file its answer to the First Amended Complaint within 21 days of this Order.

**IT IS SO ORDERED.**

Dated: October 5, 2026

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE